**STATE of Missouri, Plaintiff–Respondent,**

v.

**Kevin Dwain SCOTT, Defendant–Appellant.**

**No. SD 30913.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 31, 2011.

Nancy A. McKerrow, Special Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Jayne T. Woods, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Judge.

Kevin Dwain Scott ("Defendant") appeals his convictions of two counts of statutory rape, section 566.032,[1] and three counts of forcible sodomy, section 566.060, for which he was sentenced to serve five consecutive terms of life imprisonment. On appeal, Defendant claims that his right to a speedy trial was violated, that the trial court erred in giving an instruction based on MAI–CR 3d 312.10 (commonly referred to as the "hammer instruction"), and that the trial court erred in sentencing him to consecutive sentences. Finding no error as alleged, we affirm.

### Factual and Procedural Background

In the summer of 1997, Defendant forced his way into a trailer home where four teenage girls were having a slumber party. Once inside, he threatened the girls with harm if they screamed or tried to get help. Defendant then had sexual intercourse with one of the victims twice and forced the other three girls to put their mouths on his penis. After several hours, Defendant passed out on top of one of the girls, and another girl was able to run for help. The girl who ran for help returned to the trailer home with Missy McClary and Danny Carberry. Carberry hit Defendant over the head with a small baseball bat, and Defendant ran from the home.

When the police arrived at the trailer home, they found a pair of men's jeans with Defendant's identification in the pocket. Later, they discovered Defendant in

---

1. Unless otherwise indicated, all statutory references are to RSMo 1994.

the woods not far from the trailer home and arrested him. When he was discovered, Defendant was wearing a pair of girls' size 4 Gap jeans.

■ Defendant was tried and convicted, and those convictions were affirmed on appeal. *State v. Scott*, 78 S.W.3d 806 (Mo. App.2002). Defendant timely sought Rule 29.15 [2] post-conviction relief, and the motion court entered an order vacating Defendant's convictions and sentences on February 25, 2010.[3] The State did not appeal that order, *see* Rule 29.15(a) and (k), and the criminal case was scheduled for retrial.

On April 2, 2010, Defendant filed a motion to dismiss the charges against him. The motion alleged that while Defendant's pro se motion for post-conviction relief had been timely filed on October 28, 2002, appointed counsel failed to file the amended motion for post-conviction relief until August 26, 2005. The motion also alleged that the original judgment granting relief was supposed to be issued on January 25, 2010, but that both that document and another issued on February 9, 2010, were "irregular." The motion then argued that this delay violated post-conviction rules and that any attempt to retry him would result in a violation of his right to a speedy trial.

Defendant's trial began on August 31, 2010. The parties addressed the motion to dismiss on the record when they discussed other pre-trial matters. Defendant's attorney stated that Defendant had been prejudiced by the delay because two witnesses—Missy McClary and a nurse who

had examined the girls after the attack—had died and were no longer available to testify. The trial judge asked whether their testimony had been preserved, and Defendant's attorney stated that there had been a deposition of the nurse and that McClary's version of the events was available in a recording made by an investigator. The trial court indicated that those recordings would be permitted in evidence and asked what further effect the delay had on Defendant's ability to defend against the charge. Defendant shook his head, and his attorney replied "None that I can think of at this time, Judge." The trial court denied Defendant's motion to dismiss, finding that the delay was, in part, Defendant's fault because he could have sought a writ to compel more timely attention to his post-conviction case at an earlier time and that the defense was not prejudiced because of the alternatives available for the testimony of the unavailable witnesses.

During trial, each of the victims testified about the attack and identified Defendant as the attacker. Carberry also explained how he hit Defendant on the head and stayed to help police locate Defendant even though Carberry "was on the run from the law."

Defendant's theory of the case involved two central contentions: that all of the girls were not being truthful as shown by their demeanor during the investigation, and that Defendant could not have committed the crimes because of a medical condition. In support of the first conten-

2. All rule references are to Missouri Court Rules (2011).

3. Defendant filed a Supplemental Legal File containing documents from his post-conviction action. The State then filed a motion to strike the Supplemental Legal File. This Court may not take judicial notice of another court's files, *State v. Collett*, 526 S.W.2d 920, 929 (Mo.App.1975) ("Although we may take judicial notice of our own records, ... matters of record in other courts are denied notice."). The documents in Defendant's Supplemental Legal File were not judicially noticed or otherwise put into the record in the trial court. Thus, the State's motion to strike Defendant's Supplemental Legal File is granted.

tion, Defendant adduced evidence that the girls giggled and laughed while they were at the hospital and during depositions. Then, the recorded statement Missy McClary had made during the investigation was played for the jury. In her statement, McClary corroborated Carberry's statement about going to rescue the girls. She also noted that when she and Carberry arrived at the trailer home, the place was very messy and "you could smell sex, intercourse, very strong in the house." There was also evidence that one of the girls attended a gathering a day or two after the attack and she seemed to act normal.

In support of the second contention, Defendant adduced testimony from a doctor that Defendant had Raynad's Syndrome, a condition that reduced his ability to grip things with his hands. An investigator testified that he did not find any semen stains in the photographs of the scene. Testimony from the serologist who tested the physical evidence in the case showed that no traces of semen were found in the victims' rape kits and that the blood found at the scene was not tested because the investigators did not provide the necessary control samples for comparisons.

Defendant testified in his own defense. He said that on the night of the attack, he was merely waiting at the trailer home for the girls' mother to arrive and help him locate the girls' father so that Defendant could buy marijuana from him. While Defendant was waiting, he fell asleep. The next morning, he woke up to the sound of girls screaming, and Missy McClary hit him over the head with a full-size metal baseball bat. Defendant denied any inappropriate contact with the girls.

The jury retired to deliberate at 6:47 p.m. At 8:29 p.m., the jury asked for and was permitted to examine the photographs that had been admitted into evidence. At 9:45 p.m., the jury requested the transcript of the serologist's testimony. The trial court responded by instructing the jury to be guided by their collective memories of the evidence. At 11:37 p.m., the judge met with the parties and announced his intention to give an instruction patterned after MAI–CR3d 312.10, "based upon the time that has passed" which had caused the judge to believe that the jury was deadlocked. The judge then gave the parties an opportunity to make a record. The prosecutor agreed with the judge's plan and further requested that the jury be allowed to deliberate for another hour before the judge declared a mistrial. Defendant's attorney requested that a mistrial be declared or, in the alternative, that no hammer instruction be given. The judge had the jury brought back into the courtroom, and he read them the following instruction:

> You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

The jury returned thirty-nine minutes later at 12:16 a.m. with guilty verdicts on all counts.

Upon the agreement of the parties and the jury, the sentencing phase of the trial was held immediately. The only evidence presented was a statement by one of the victims, who said she believed Defendant

"should never be allowed to walk amongst society every [sic] again." The jury recommended a life sentence on each count.

At sentencing three weeks later, the following exchange occurred:

BY [THE PROSECUTOR]: ... I call the Court's attention to Missouri Statute 558.026, subsection one. It would appear that consecutive sentences are required.

BY THE COURT: Thank you. What subparagraph did you say?

BY [THE PROSECUTOR]: Subsection one, 558.026.

BY THE COURT: Thank you.

BY [THE PROSECUTOR]: Last sentence.

BY THE COURT: Counsel, have you had opportunity to review it?

BY [DEFENSE COUNSEL]: I have looked at it, Judge.

BY THE COURT: All right. All right. Anything else from the state?

BY [THE PROSECUTOR]: No, Your Honor.

BY THE COURT: And from the defense?

BY [DEFENSE COUNSEL]: Judge, I think the Court has discretion on the sentence, it doesn't have to follow the recommendation of the jury, and I would ask that you sentence [Defendant] to a term not greater than what the previous jury sentenced, which was, as I recall, two life sentences on statutory rape and then three sentences of fifteen years on each of the forcible counts. That is all I have.

BY THE COURT: Thank you. Any reason sentence should not be pronounced at this time?

 * * * * * *

BY [DEFENSE COUNSEL]: ... I have no other reason.

BY THE COURT: My victims are present? Do I have all of them?

Three? All right. I am going to speak to the victims and then I am going to rule on my sentence. I want you to understand something. I have worked in a courtroom for many, many, many years. I have played many different roles. I want you to understand that it is one of the most impressive, courageous things that I have ever witnessed in my life to see you ladies appear and once again have to go through the tragic events that occurred to you at the hands of this man. I cannot take away the events, but I can tell you that your courage is impressive, it touches our hearts. Most importantly, I cannot take that away from you, but I can thank you for being willing to come and ensure that this man will never harm another child again. And without your willingness to do that it would have been impossible to complete. On behalf of the legal system I apologize to you for having to go through this process again. If I could take that away I would. But I am highly impressed when I see young ladies who have gone through this process. He silenced you that night, but he did not silence you during this trial. You were heard, and it mattered, and the jury listened to you, and they believed you, and they saw the truth, and they have appropriately punished this man for the things that he has done to you. You received your life sentence that night, he will receive his today. It is the decision of this Court that the Defendant will be under the supervision of the Department of Corrections for a term of life on the charge of statutory rape in the first degree as alleged in Count I. It is the decision of this Court that the Defendant will be under the supervision of the Department of Corrections for a term of life upon the charge of statutory rape in the first degree as alleged in Count II. That will

be running consecutive to Count I. It is the decision of this Court that as to Count III the Defendant will be sentenced to the Department of Corrections under their supervision for a term of life for forcible sodomy. That will be consecutive to Count I and II. It is the decision of this Court that the Defendant will be under the supervision of the Department of Corrections for a term of life upon the charge of forcible sodomy as alleged in Count IV. That will also be consecutive to Counts III, II, and I. It is the decision of this Court that the Defendant will be sentenced under the supervision of the Department of Corrections for a term of life on the charge of forcible sodomy as alleged in Count V of the information. That will be running consecutive to Counts IV, III, II, and I.

Defendant now appeals, claiming error in the denial of his motion to dismiss, the submission of MAI–CR 3d 312.10, and the trial court's order that his sentences be served consecutively.

### Discussion

### Speedy Trial Claim

In his first point, Defendant challenges the trial court's denial of his motion to dismiss arguing that the delay before his retrial resulted in a denial of due process. Appellate courts review a trial court's ruling on a motion to dismiss for abuse of discretion. *State v. Loewe,* 756 S.W.2d 177, 182 (Mo.App.1988). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Kleine,* 330 S.W.3d 805, 808 (Mo.App.2011).

Defendant's motion to dismiss alleged a due-process violation based on the delay caused by the slow processing of his post-conviction case. On appeal, he argues that this claim presents a question of first impression and should be treated like cases involving pre-indictment delay. The State responds that until the post-conviction court entered its order vacating Defendant's convictions and sentences, Defendant was not entitled to a trial, thus the claim should be analyzed as if it was a speedy-trial claim involving only the time between the granting of the post-conviction motion on February 25, 2010, and the date of trial on August 31, 2010.

■■■ Underlying the parties' disagreement is the fact that the criminal defendant's constitutional right to a speedy trial is protected in two ways. The right to a quick accusation is protected by the statute of limitations and the due process clause of the Fifth Amendment. *United States v. Marion,* 404 U.S. 307, 325–26, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In analyzing these claims, courts look at the time between the crime itself and the time of trial. *See, e.g., State v. Robinson,* 696 S.W.2d 826, 830 (Mo.App.1985). The right to a speedy disposition of the charges once they are brought is protected by the Sixth Amendment. *See, e.g., State ex rel. Garcia v. Goldman,* 316 S.W.3d 907, 911 (Mo. banc 2010); *Robinson,* 696 S.W.2d at 831. In Sixth Amendment speedy-trial cases, the pertinent time period begins at arrest or indictment; that is, when a suspect officially becomes an accused. *Marion,* 404 U.S. at 313, 92 S.Ct. 455. While both protections involve a balancing of interests, *see Robinson,* 696 S.W.2d at 830–31 (noting that pre-indictment delay is assessed using "a combination of factors such as those employed in *Barker* [*v. Wingo,* 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ]," the interests protected are different). The Fifth Amendment is primarily concerned with the possibility of impairment of the defense. *Marion,* 404 U.S. at 324–25, 92 S.Ct. 455. The Sixth Amend-

ment, on the other hand, in addition to protecting the defendant's ability to defend against the charges, also protects the defendant's interests in avoiding both oppressive pre-trial incarceration and the anxiety and concern caused by pending charges. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. In both situations, the interests of the defendant must be balanced with the State's interest in the sound administration of justice. *Marion,* 404 U.S. at 324–25, 92 S.Ct. 455.

■ The flaw in Defendant's argument is that this case is not factually similar to cases involving pre-indictment delay, so the appropriate balance of the interests at stake is different. In the present case, Defendant was arrested on the morning following the day the crimes were alleged to have occurred. Thus, the delay between the crime and the point in time when Defendant became an accused was negligible. Any argument that the time involved in processing the post-conviction case should be included in the period of time before the initiation of proceedings ignores this fact with important analytical consequences. As Defendant was arrested, brought to trial, and convicted before the time he seeks to charge against the State, the interests involved in his case are different than the interests involved in a case where the accused has no knowledge that a charge is pending. Unlike a person who had no knowledge of a pending investigation, Defendant was able to gather and preserve evidence, and these actions diminished the prejudicial effect, if any, of the delay.

■ Consequently, as the State's argument suggests, this claim should be analyzed under the Sixth Amendment rubric.[4] Analysis of Sixth Amendment speedy-trial claims is governed by *Barker.* *State v. Buchli,* 152 S.W.3d 289, 307 (Mo.App. 2004). The analysis involves balancing four factors, including the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). The length of the delay is sometimes considered a threshold: "Until there is some delay that is presumptively prejudicial, we need not inquire into the other three factors used to determine if the defendant has been deprived of his right to a speedy trial." *Dillard v. State,* 931 S.W.2d 157, 162 (Mo.App.1996). Delays of more than eight months are presumptively prejudicial. *Id.*

In the present case, Defendant was arrested in 1997, and the trial resulting in his present convictions began in 2010. This delay more than meets the eight-month threshold, so the disposition of Defendant's claim must turn on a balancing of the remaining three *Barker* factors.

In determining how to weigh the second *Barker* factor—the reason for the delay—in the context of the present case, the question we confront is how the delay caused by a collateral attack on a conviction should be classified. As to this factor, "the conduct of both the prosecution and the defendant are weighed." *Vermont v. Brillon,* —— U.S. ——, 129 S.Ct. 1283,

4. Because we find the Sixth Amendment provides the appropriate framework, Defendant's reliance on *United States v. Barket,* 530 F.2d 189 (8th Cir.1976), analyzing a Fifth Amendment claim, is not persuasive.

Furthermore, though we adopt the State's view that the Sixth Amendment provides the appropriate framework for the analysis, we do not adopt its suggestion that the relevant time period should be measured from the time that Defendant was granted post-conviction relief. That would ignore the fact that even where there is good cause for delay, such delay still results in the possibility that memories will fade and evidence will be lost. To properly account for all the competing interests, the relevant time period must be calculated from the original arrest.

1290, 173 L.Ed.2d 231 (2009). "Different weights are assigned to different reasons for a delay." *Garcia*, 316 S.W.3d at 911. "A deliberate attempt by the state to delay the trial is weighted heavily against the government, while '[a] more neutral reason such as negligence ... should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant.'" *Id.* (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. 2182). However, "[i]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine." *Brillon*, 129 S.Ct. at 1290. For example, "[w]here the defendant 'has contributed to the delay by asking for and being granted continuances, he cannot later successfully allege the denial of his constitutionally guaranteed right to a speedy trial.'" *Robinson*, 696 S.W.2d at 832 (quoting *State v. Harris*, 673 S.W.2d 490, 494 (Mo.App.1984)).

Similarly, delay that is the result of an appeal generally "is 'attributable to defendant[,]'" *State v. Howell*, 581 S.W.2d 461, 463 (Mo.App.1979) (quoting *State v. Lane*, 551 S.W.2d 900 (Mo.App.1977)), and time reasonably consumed by such an appeal "'cannot be considered as in derogation of a speedy trial.'" *Howell*, 581 S.W.2d at 463 (quoting *People v. Chism*, 390 Mich. 104, 113, 211 N.W.2d 193, 197(3) (1973)). The reason for this conclusion is that "'[t]he time necessarily consumed in unraveling complex issues whose ultimate resolution vindicates the rights of the accused can hardly be said to constitute purposeful or oppressive delay.'" *Howell*, 581 S.W.2d at 464 (quoting *Harrison v. United States*, 128 U.S.App.D.C. 245, 249–50, 387 F.2d 203, 207–08 (1967)). Were retrial not permitted after such appeals, appellate courts might be less assiduous in their protection of the rights of the accused for fear that a criminal might go free on mere technical grounds. *United States v. Loud*

*Hawk*, 474 U.S. 302, 313, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (analyzing a claim involving delay caused by an interlocutory appeal). In fact, the United States Supreme Court has held that delays occasioned by interlocutory appeals do not establish a violation of the defendant's right to a speedy trial because an appeal, even one by the State, "is a valid reason that justifies delay." *Id.* at 316, 106 S.Ct. 648. Further, this Court, in *Howell*, 581 S.W.2d at 465, held that the time consumed in an appeal resulting in a reversal of the original conviction did not count against the State for purposes of the speedy-trial analysis. *See also Harrison*, 392 U.S. at 221 n. 4, 88 S.Ct. 2008.

In the present case, the delay attributable to the post-conviction proceeding should be treated in the same manner as delay caused by an appeal. It is factually similar to such a case because both situations involve legal proceedings which occur after an accused has been afforded a trial. Furthermore, just as in the case of an appeal, the post-conviction case sought to examine the fairness of the original trial, and its primary purpose was to vindicate Defendant's constitutional rights. *See* Rule 29.15(a) (explaining that the rule provides a vehicle for claims that a "conviction or sentence imposed violates the constitution and the laws of this state or the constitution of the United States[.]"). In fact, the justification for attributing the delay of a post-conviction case to the defendant is even stronger than the justification for doing so in the case of an appeal. In a post-conviction action, not only has the defendant already had a trial, but that trial was either conceded by the defendant to be without prejudicial error meriting an appeal or the court on appeal has determined that the trial actually had no prejudicial error. A post-conviction case, which is a collateral attack upon the criminal conviction, is one step beyond the direct

appeal of that conviction. In this next step, the issues become more complex, as they involve more layers of analysis and often the presentation of additional evidence.

Defendant presented no evidence showing that the delay in processing his post-conviction case was attributable to the State.[5] Thus, this factor weighs against Defendant.

The third factor in the speedy-trial analysis involves examination of how and when the defendant asserts his right to a speedy trial. *State v. Nelson*, 719 S.W.2d 13, 19 (Mo.App.1986) (citing *Barker*, 407 U.S. at 526, 92 S.Ct. 2182). When the defendant asserts his right later in the proceeding through a motion to dismiss rather than a motion for an immediate trial, his actions will be read to "indicat[e] a desire to avoid trial rather than to have a speedy trial." *Nelson*, 719 S.W.2d at 19. Here, Defendant did not assert this right until April 2010, almost thirteen years after his initial arrest. There is no indication that a speedy-trial issue was raised before the first trial. *See Scott*, 78 S.W.3d 806. Furthermore, Defendant's motion sought dismissal of the case rather than a speedy trial. Thus, it appears that his assertion of the right was a stratagem to avoid further prosecution. *See Nelson*, 719 S.W.2d at 19. This factor weighs against Defendant.

■ The final and most important factor also weighs against Defendant. To determine whether the defendant has suffered from prejudice that would warrant dismissal for violation of the defendant's right to a speedy trial, appellate courts "consider the oppressiveness of pre-trial incarcer-ation, whether it unduly heightened defendant's anxiety, and possible impairment of the defense." *State v. Loewe*, 756 S.W.2d 177, 182 (Mo.App.1988). Impairment to the defense may occur where defense witnesses become unavailable or "are unable to recall accurately events of the distant past." *Garcia*, 316 S.W.3d at 912. Under such circumstances, however, no impairment occurs where the defendant had an adequate substitute, such as another witness who could testify to the same facts. *Loewe*, 756 S.W.2d at 183.

Here, the trial court found that Defendant was not prejudiced because there were adequate substitutes for the evidence he claims was lost due to the delay. Defendant claims he was unable to present his defense because McClary and the nurse who had examined the girls after the attack had died and thus were unavailable to testify at trial. But the evidence those witnesses would have presented was available through the recorded statements made during the original investigation and the preparation for Defendant's first trial. McClary's statement was even used at trial, without objection by the State. To the extent that Defendant also claims his defense was hampered by the various witnesses' lack of memory, this claim was not presented to the trial court and is speculative, as such lapses in memory could also have affected the State's ability to prove the elements of the case. *See State v. Farris*, 877 S.W.2d 657, 663 (Mo.App.1994) (finding that "time can tilt the case against either side, ... one cannot generally be sure which of them it has prejudiced more severely."). Defendant has failed to dem-

---

5. Although Defendant includes documents in his Supplemental Legal File to support his assertion that he was doing all he could to obtain quick action in his post-conviction case, as discussed above in note 2, those documents are not properly before us. Further-more, even if they had been, they would not justify weighing this factor against the State as the actions of a defendant's attorney will be attributed to the defendant when courts analyze a speedy-trial claim. *Brillon*, 129 S.Ct. at 1290–91.

onstrate that the trial court's lack of prejudice finding was an abuse of discretion.

When all the factors are weighed together, Defendant's right to a speedy trial was not violated. While the time between the arrest and the beginning of the trial that resulted in the present convictions was more than thirteen years, much of that delay was occasioned by Defendant's post-conviction action. In addition, Defendant's assertion of his right at such a late time and in the context of a motion to dismiss rather than a motion for immediate trial weighs heavily against him, as it indicates his desire to avoid trial altogether. Finally, Defendant failed to prove that his defense was impaired by the delay. The trial court did not abuse its discretion in denying Defendant's motion to dismiss. Point denied.

### Hammer Instruction Claim

■ Defendant claims that the trial court's decision to give the hammer instruction based on MAI–CR 3d 312.10 was an abuse of discretion because the trial judge did not know whether the jury was deadlocked and because the jury returned its verdicts only thirty-nine minutes after the instruction was given. This claim is without merit.

■ The decision of whether to give the hammer instruction is within the sound discretion of the trial court. *State v. Copple,* 51 S.W.3d 11, 14 (Mo.App.2001). "To establish an abuse of discretion it must be shown that, based on the record of what was said and done at the time of trial, the verdict of the jury was coerced." *State v. Kinder,* 858 S.W.2d 838, 840 (Mo.App. 1993).

■ "The giving of the hammer instruction itself is not coercive, as 'it urges frank and open discussion, tolerance, and the desirability of a unanimous verdict but cautions each juror against basing a verdict on evidence he does not believe is true.'" *Copple,* 51 S.W.3d at 14 (quoting *Kinder,* 858 S.W.2d at 840). To determine "whether a jury's verdict has been coerced by the giving of the hammer instruction, an appellate court considers several factors, including: (1) the amount of time the jury deliberates before the instruction is given, (2) the amount of time that elapses between the reading of the instruction and the verdict, (3) whether the trial court knows numerically how the jury is split and the position of the majority, and (4) whether the giving of the instruction conforms with the Notes on Use." *Copple,* 51 S.W.3d at 14. We observe that the first factor is subsumed within the fourth factor, so we will address them together.

The trial court followed the Notes on Use in determining whether to give the hammer instruction. The Notes on Use provide that the hammer instruction "may be given when the Court deems it appropriate and when the length of deliberation *or* communication from the jury causes the Court to believe the jury *may* be deadlocked." MAI–CR 3d 312.10, Notes on Use 2–5 (emphasis added).

■ The use of the word "may" is important because it indicates that the judge need not be certain about the status of deliberations before deciding to give the instruction. Furthermore, the Notes on Use list the conditions that the judge may rely on to make his decision in the alternative; that is, not all of those conditions need to be satisfied to justify a trial court's decision to use the instruction. Here, given the length of deliberations and the lateness of the hour, the judge believed the jury might be deadlocked. This was all that was required.

The fact that the trial judge followed the Notes on Use without extraneous comment also serves to distinguish this case from *State v. Burns,* 808 S.W.2d 1 (Mo.App. 1991), upon which Defendant relies. De-

fendant cites *Burns* for the proposition that reversal is required if it is conceivable that the jury's verdict was coerced. However, in *Burns,* unlike in the present case, the judge added additional warnings to the jury before giving the instruction about the necessity of a verdict and failed to give the parties an opportunity to object. 808 S.W.2d at 2. Here, where the trial court followed the Notes on Use and gave only the approved instruction, the risk of coercion was minimized. *See State v. Hayes,* 563 S.W.2d 11, 12 (Mo. banc 1978) (noting the importance of the cautionary language in the then-current approved instruction that "no juror should ever agree to a verdict that violates the instructions of the Court, nor find that which under the evidence and his conscience he believes to be untrue.").

As to the second factor, Missouri courts have repeatedly held that a quick return of a verdict after giving the hammer instruction, standing alone, does not demonstrate coercion. *See, e.g., Kinder,* 858 S.W.2d at 840; *State v. Harris,* 751 S.W.2d 131, 132 (Mo.App.1988); *State v. Smith,* 686 S.W.2d 43, 45–46 (Mo.App.1985). We need not consider whether thirty minutes is a "quick return" because even if it was, it does not, standing alone, support that the verdicts were coerced.

The third factor favors the trial court's decision to give the instruction. Contrary to the implication in Defendant's argument, the judge was not required to ask for a communication from the jury stating that they were deadlocked. In fact, the case law suggests that such action would have supported a finding of coercion. *See, e.g., State v. McNail,* 767 S.W.2d 84, 86–87 (Mo.App.1989). Here, the trial court had no knowledge as to the numerical split of the jury or the position of the majority.

The jury's verdicts were not coerced, and thus the trial court did not abuse its

discretion in giving this instruction. Point denied.

### *Sentencing Claim*

 In his final point, Defendant claims, citing *Williams v. State,* 800 S.W.2d 739 (Mo. banc 1990), that the trial court plainly erred in ordering his sentences to run consecutively because the trial court was under the incorrect impression that the law required the sentences to run consecutively. This claim is not supported by the record.

As Defendant concedes, this claim is not preserved for review because Defendant failed to object or to include the claim in his motion for new trial. *See State v. Williams,* 306 S.W.3d 183, 185 (Mo.App. 2010). "Plain error review is discretionary and involves a two-step analysis." *State v. Mashek,* 336 S.W.3d 478, 484 (Mo.App. 2011). "First, this Court considers the facts and circumstances to facially determine if there was plain error—meaning 'evident, obvious and clear' error." *Id.* (internal citation omitted). "Only if this Court identifies plain error do we proceed to the second step of determining whether manifest injustice, or a miscarriage of justice, resulted." *Id.* Furthermore, "[t]he assertion of plain error places a much greater burden on a defendant than when he asserts prejudicial error." *State v. Anderson,* 294 S.W.3d 96, 98 (Mo.App. 2009).

 Section 558.026.1, RSMo Supp. 1995, provides, in part, that

in the case of multiple sentences of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid and for other offenses committed during or at the same time as that rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid, the sentences of imprisonment imposed for the other offenses may run

concurrently, but the sentence of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid shall run consecutively to the other sentences.

Under this statute, the trial court has discretion to run sentences concurrently if all of the defendant's convictions are for crimes listed in the statute, but where the crimes committed consist of enumerated and non-enumerated offenses, the sentences for the enumerated crimes must be run consecutively to those for the non-enumerated crimes. *State v. Hill*, 817 S.W.2d 609, 611 (Mo.App.1991).

 When the record demonstrates that the trial court imposed consecutive sentences based on a misunderstanding of the statute, the defendant is entitled to re-sentencing. *State v. Freeman*, 212 S.W.3d 173, 177 (Mo.App.2007). This may occur, for example, where the prosecutor states an erroneous interpretation of the statute and the judge imposes consecutive sentences without further discussion or comment. *See id.* Where, on the other hand, the record demonstrates that the judge's decision to impose consecutive sentences was based on valid considerations, such as independent consideration of the severity of the crimes, no error will be found. *See State v. Seaton*, 815 S.W.2d 90, 91–92 (Mo. App.1991).

For example, in *Seaton*, the prosecutor's recommendation implied that section 558.026 required the court to impose consecutive sentences. *Id.* In pronouncing sentence, the trial judge stated that it was going to follow the prosecutor's recommendation because he wanted to send a message to the Department of Corrections that the defendant should not be freed because the crimes the defendant had committed were very serious. *Id.* When the

defendant challenged the consecutive sentences on appeal, citing *State v. Burgess*, 800 S.W.2d 743, 744 (Mo. banc 1990),[6] the appellate court found no error because the trial judge's statements showed that the court did not base its decision on the erroneous interpretation of the statute but rather on appropriate consideration of the seriousness of the crimes committed. *Seaton*, 815 S.W.2d at 92.

Here, as in *Seaton*, the trial judge's comments demonstrate that he decided to impose consecutive sentences based on proper considerations. After the prosecutor stated " '[i]t would appear that" section 558.026 required consecutive sentences, the judge asked for the defense position, which was that "the Court has discretion on the sentence[.]" The court then commended the courage shown by the victims and commented that he believed the jury appropriately recommended life sentences. The trial court's comments, along with the action of asking Defendant's attorney for a response to the State's position, indicate that, unlike the judges in *Williams*, *Burgess*, and *Freeman*, the judge in the present case did not simply rely on the prosecutor's incorrect interpretation of the statute but exercised his independent discretion in determining that consecutive sentences were appropriate.

Defendant has failed to meet his burden of demonstrating plain error in his sentencing. Point denied.

### Conclusion

The trial court's judgment is affirmed.

BURRELL, P.J., C.J., and RAHMEYER, J., concur.

---

6. *Burgess* was a companion case to *Williams*, 800 S.W.2d 739. *Burgess*, 800 S.W.2d at 744.