**STATE of Missouri, Respondent,**

v.

**Kenneth R. MESSENHEIMER,
Appellant.**

**No. 17346.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 8, 1991.

Marcie W. Bower, Columbia, for appellant.

William L. Webster, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant Kenneth R. Messenheimer, tried as a prior offender, § 558.016.2, RSMo Cum.Supp.1990, was found guilty by a jury of burglary in the second degree, § 569.170, RSMo 1986, and sentenced by the trial court to five years' imprisonment.

Appellant's sole point relied on avers the trial court erred in denying appellant's motion for mental examination and in subjecting him to trial without such examination. Appellant maintains this violated his rights to due process of law and a fair trial guaranteed by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, sections 10 and 18(a), of the Constitution of Missouri (1945), in that there was "sufficient indicia of appellant's irrational behavior" to establish reasonable cause to believe he lacked mental fitness to proceed.

Because the sufficiency of the evidence to support the verdict is unchallenged, we synopsize only the evidence necessary to resolve the assignment of error.

On September 7, 1990, appellant was residing in an abandoned apartment building in Joplin, just north of a house occupied by Janice Dupont and her two sons, ages nine and six. Ms. Dupont had known appellant some six weeks. They had dated and "had sex a couple of times." Appellant had baby-sat Ms. Dupont's sons in exchange for meals and laundry service. Two or three weeks prior to September 7, 1990, Ms. Dupont told appellant she no longer wanted a relationship with him.

On the evening of September 7, neighbors south of Ms. Dupont's home saw appellant trying to remove a screen from one of its windows. Ms. Dupont and her children were gone at the time. The neighbors phoned the police.

An officer arrived and saw appellant going north toward his residence. The officer ordered appellant to stop. Appellant ran toward his back door. The officer caught appellant and observed he was carrying a box fan and a sack containing several items. A woman's necklace was wrapped around appellant's wrist. Anoth-

er officer arrived, appellant was advised of his Miranda rights,[1] and the officers asked appellant "who these items belonged to." Appellant said Janice Dupont, nodded in the direction of her home, and stated, "She lives there."

Ms. Dupont arrived home while the officers were at the scene. She discovered her back door ajar. A window screen had been removed and was lying next to her house. Numerous items were missing. She identified the items seized by police from appellant as belonging to her. In addition to the box fan and necklace, the items included a nightgown, underwear, a photo album, cassette tapes, cologne, two alarm clocks, sausage, and a picture.

On November 15, 1990, appellant signed and filed a petition to enter a plea of guilty. He appeared with counsel in the trial court that date. Questioned under oath by the court, appellant acknowledged he understood: (1) the charge was burglary, (2) the range of punishment—a maximum of seven years' imprisonment and a $5,000 fine, (3) his right to a jury trial, (4) his right to be represented at trial by appointed counsel, (5) his right to confront the witnesses against him in open court, (6) his right to subpoena witnesses in his defense, and (7) his right against self-incrimination. Then, this:

"Q. Are you in fact guilty of this charge, Kenneth?

. . . .

A. No.

Q. You're not guilty of it? A. (Shakes head.)

Q. Then tell me what you did to get yourself in trouble and cause this charge to be brought against you?

A. I didn't.

Q. Then why are you pleading guilty?

A. I just don't understand.

Q. What is it you don't understand?

A. Well, I'm, you know, what I was, what I'm, what's going on. I don't know. I don't.

Q. Well, what is it you don't know? What do you feel you don't understand? 'Cause if you—

A. I mean—

Q. —if you don't understand, if you feel you're not guilty, and if there's any question in my mind at all that you don't understand, we're not going to have a guilty plea, we're going to have a jury trial, and whatever that jury decides you get is what you're most likely going to get.

A. Uh-huh. Yes.

Q. Now what, what do you think you don't understand about what's going on today?

A. Uh, like I say, I didn't do the charge.

Q. Then ... why did the police officers arrest you, and why are you standing in front of me today if you didn't do this? Do you have any idea what evidence they've got against you?

A. Yes, I got, uh, some papers there in the dorm that showed me the stuff that they had that was stolen out of the house.

Q. Well, are there going to be some police officers that will testify that they stopped you carrying stolen property?

A. Yes.

Q. And this is property stolen from this burglary?

A. Yes.

Q. Are you saying that's not true, that they didn't stop you carrying this stolen property?

A. No, I didn't say that. I said they did, they did stop me between the, the fence and my house."

The trial court asked the prosecutor what the State's evidence would be at trial. The prosecutor narrated the facts essentially as set forth earlier in this opinion. The trial court questioned appellant further:

Q. Are you saying none of that happened? That the police officers didn't catch you carrying her property?

---

**1.** Presumably the ritual required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A. Yeah, I had the stuff in my hands, yes.

Q. Well, then how'd you get it in your hands if you didn't go—

A. It was right there by the fence. I came through her yard and, uh, stopped, uh, to give her a, a long-stemmed rose, and I got, put it in her mailbox. I just came through the yard, and when I came over the fence, I just—

Q. Okay. Kenneth, if you don't think you're guilty of this, and if you're not wanting to admit the guilt, we'll just have a jury trial on December the 3rd, and we'll see if a jury will convict you.

Now, do you want to, you want to think about this and see if you remember a little better about what happened? Because if you insist that you're not guilty, I am not going to accept your guilty plea. I'm going to give you an opportunity to present that story to a jury and see if you can convince a jury that you're not guilty of this. We're not going to have this back on a post-conviction relief motion when you've already said you have trouble understanding what's going on today....

Now I'll give you some time, a few minutes, to think about it, or I'll just make an entry here that I'm not accepting your plea, and we'll have a jury trial. What do you want?

A. I don't know.

Q. Okay. A. I don't know.

. . . .

Q. So we'll have a jury trial and abide by what the jury says, Kenneth."

Two weeks later, on Thursday, November 29, 1990 (four days before trial), appellant's lawyer filed a notice of intent to rely on the defense of mental disease or defect excluding responsibility. The motion was accompanied by a motion for a mental examination averring, in pertinent part:

"2. Counsel for defendant believes that defendant may suffer from a mental disease or defect that precludes defendant from understanding the proceedings against him or properly assisting in his own defense."

The trial court took up the motion for mental examination Friday, November 30, 1990. Appellant's lawyer explained he had not requested a mental examination earlier because appellant is "coherent ... rather intelligent ... doesn't manifest any ... problems...." Counsel added: "But over the last week of investigation several allegations have come forward that even though they are being made by the State's main witness ... cause concern for me.... [S]pecifically the ... allegation is that [appellant] has made threats to ... the State's witness. That in the past the [appellant] has, when the State's witness ... was in her back yard ... hanging her laundry, that the [appellant] was in his back yard wearing nothing from the waist down. Uh, all this came to my attention ... just this last week when doing the final preparations for trial."

The prosecutor stated it had come to his attention that Ms. Dupont had problems with appellant. Specifically, said the prosecutor, appellant "has come over, bothered her, harassed her, cut her phone line, egged her car...." The prosecutor added, "[S]he related to me the fact that he would stand in his back yard and masturbate while she was hanging out her clothes."

The trial court asked whether appellant had a history of treatment for mental or emotional problems. Appellant's lawyer replied, "None that I could locate, Judge."

The trial court asked appellant's lawyer whether he had observed any conduct by appellant indicating mental disease or defect. Counsel described an instance when he and appellant were conferring in jail about pleading guilty. Appellant asked whether he would be allowed to visit his family before delivery to prison. Counsel said it would be up to the jail warden. Appellant stood up quickly, propelling his chair backward against the wall, and "stormed out of the room." Counsel conceded one explanation for that behavior was that appellant was angry with counsel. Counsel also stated appellant denied prior convictions although there was evidence he had one.

The trial court alluded to appellant's responses during the aborted guilty plea proceeding two weeks earlier. The court stated that although appellant was unwilling to admit guilt, the court saw nothing that indicated appellant was unable to understand the proceedings or assist in his defense. Emphasizing the absence of history of mental illness, the court ruled there was no basis for ordering a mental examination. Additionally, the court rejected the notice of intent to rely on the defense of mental disease or defect as untimely.[2]

Trial took place as scheduled, December 3, 1990. Outside the jury's presence, appellant's lawyer stated he had informed appellant it was appellant's decision whether to testify. Additionally, said counsel, he had informed appellant that if he took the stand, the prosecutor could impeach him with a prior burglary conviction and he would be subject to cross-examination. Counsel stated appellant had decided not to testify.

The trial court thereupon addressed appellant:

"The Court: Mr. Messenheimer, has ... your attorney correctly stated the situation?

The Defendant: Yes, sir.

The Court: And it's your decision not to testify?

The Defendant: Yes, sir."

At time of sentencing, January 10, 1991, the trial court noted the presentence investigation report revealed appellant once "had a family and some children," and there were numerous "hotline calls" and indications he had physically neglected and abused his children. The court asked whether that was correct. This colloquy ensued:

"The Defendant: Well, what, what come across that, they, they come across they had lice and we didn't know nothing about it. So they figured that they wasn't suitable for with us.

. . . .

The Court: But in any event, the Juvenile Court of Jackson County, Missouri, terminated all of your parental rights to all of your children, did it not?

The Defendant: Yes, sir, they did.

The Court: And that was over something a little more serious than your children having head lice, wasn't it?

The Defendant: But I couldn't be able to hold a job. I always had my hand in a cast. I would get my hands broke with my job.

The Court: Anything else you want to say or present to me, Mr. Messenheimer?

. . . .

The Defendant: ... me and [defense counsel] was standing there talking that, that I, the reason I should be, be put on probation. But I just, I don't have no way of, way of words. I mean, like I've told you before, you know, I never been as high school, don't really barely speak English anyway.

The Court: Anything else you want to say or present to me, Mr. Messenheimer?

The Defendant: Well, I would have been proper dressed today, but my, my clothes were stolen out of the Jasper County Jail.

. . . .

The Court: ... Mr. Messenheimer, the Public Defender's Office has filed a notice of and a claim for value of legal services requesting a judgment in the amount of $500 as the value of their legal services in this case. This is in accordance with the law and certain rules and regulations. Do you have any questions about that?

The Defendant: I won't be able to pay that if I'm going to prison.

The Court: Well, obviously you can't get blood out of a turnip, but do you have any questions about the judgment being entered? If you win the lottery or something, obviously it would be collected from you.

---

**2.** Section 552.030.2, RSMo 1986, reads: "Evidence of mental disease or defect excluding responsibility shall not be admissible at trial of the accused unless the accused, at the time of entering his plea to the charge, pleads not guilty by reason of mental disease or defect excluding responsibility, or unless within ten days after a plea of not guilty, or at such later date as the court may for good cause permit, he files a written notice of his purpose to rely on such defense. . . ."

The Defendant: Okay."

In support of his contention that there was reasonable cause to believe he was mentally unfit to be tried, appellant cites *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Neither aids him. In each of those cases the behavior of the accused was strongly indicative of mental unfitness to proceed. Appellant's behavior did not resemble that in *Drope* or *Pate*.

■ If a judge at any stage of a criminal proceeding has reasonable cause to believe the accused, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his defense, the judge must order a mental examination. *Howard v. State*, 698 S.W.2d 23, 25[9] (Mo.App.1985); *State v. Moon*, 602 S.W.2d 828, 834–35[10] (Mo. App.1980). However, a trial court is vested with broad discretion in regard to ordering a mental examination. *Howard*, 698 S.W.2d at 25[10]; *State v. Beal*, 602 S.W.2d 22, 23[2] (Mo.App.1980). Sufficient cause for investigation does not exist if an accused has the present ability to consult with his lawyer with rationality and to understand the proceedings against him. *Ford v. State*, 757 S.W.2d 255, 256[2] (Mo. App.1988); *Shelley v. State*, 655 S.W.2d 126, 128 (Mo.App.1983).

■ At the guilty plea proceeding, appellant, then age 36, acknowledged he understood the matters enumerated in the eighth paragraph of this opinion. He admitted he was carrying the items stolen from Ms. Dupont's residence when the officer stopped him. He attempted to explain away this incriminatory fact by saying he found the items by the fence.

At the hearing on the motion for mental examination, appellant's lawyer stated appellant was coherent, rather intelligent, and manifested no problems. Appellant had no record of treatment for mental or emotional problems.

At trial, appellant's lawyer stated he had informed appellant that if he took the stand, the prosecutor could impeach him with a prior burglary conviction and cross-examine him. Counsel announced appellant had decided not to testify. Upon questioning by the trial court, appellant said his lawyer had correctly stated the matter and it was appellant's decision not to testify.

At the sentencing hearing, appellant denied his parental rights were terminated because he had physically neglected and abused his children. He stated they had head lice and he was unable to hold a job because of injury. Additionally, appellant requested probation and stated he would have been more suitably dressed had his clothes not been stolen from the jail. Finally, appellant stated he would be unable to pay the $500 judgment for public defender services if he were imprisoned, but understood the judgment could be collected if he won the lottery.

Such a record conclusively refutes appellant's contention there was reasonable cause to believe he was unable to understand the proceedings against him or assist in his defense.

We have not disregarded the report of Ms. Dupont that appellant masturbated in his back yard while she hung out her laundry. While this is manifestly abnormal behavior, it could reasonably be viewed as part of an ongoing harassment of Ms. Dupont by appellant after she broke off their relationship. The harassment included cutting her telephone line and egging her car.

Appellant's anger at being told there was no assurance he would be allowed to visit his family before delivery to prison is consistent with frustration from confinement and disgust with counsel. Appellant's lawyer conceded this. Counsel also acknowledged appellant's denial of the prior conviction was not the first time a client had done so.

The trial court did not err in denying appellant's motion for a mental examination.

Judgment affirmed.

PREWITT, P.J., and PARRISH, J., concur.