STATE of Missouri, Plaintiff–
Respondent,

v.

Ralph T. SMITH, Jr., Defendant–
Appellant.

No. SD 30986.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 28, 2012.

Kent Denzel, Assistant Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, for Respondent.

Ralph T. Smith, Jr. ("Defendant"), was charged with the class A felony of robbery in the first degree with what appeared to be a deadly weapon, pursuant to section 569.020, and the class B felony of robbery in the second degree, pursuant to section 569.030.[1] A jury found Defendant guilty of both offenses, and the trial court sentenced Defendant as a prior and persistent offender to thirty years in prison on each robbery, with the sentences to run concurrently. Defendant appeals his convictions, claiming that the trial court erred in denying (1) his oral pretrial request for an examination to determine if he was mentally fit to proceed, pursuant to section 552.020, (2) his motion to sever the two charges, (3) his motion to dismiss because of a violation of his constitutional right to a speedy trial, and (4) his oral request for a new preliminary hearing. Finding no merit in Defendant's claims, we affirm Defendant's convictions.

### Factual and Procedural Background

Defendant was arrested on September 1, 2006, following two robberies that occurred earlier that day in Joplin and formed the basis for criminal charges against him. The charges were robbery in the first degree of Charles Souder with what appeared to be a deadly weapon, and robbery in the second degree of Twyla Landrith.[2] In the Landrith robbery, which occurred before the Souder robbery, the State claimed Defendant "forcibly stole" Landrith's cash. In the Souder robbery, the State claimed Defendant "forcibly stole" Souder's vehicle and "displayed what appeared to be a deadly weapon." Defendant posted bond and was released from custody pending trial on these charges.

At the end of March 2007, Defendant was arrested on unrelated Jasper County charges of assault in the first degree and burglary in the first degree. The assault and burglary were alleged to have occurred on March 29, 2007. Defendant remained in custody on these charges because he was unable to post bond.

---

1. All references to statutes are to RSMo 2000.

2. We use the spelling of the name Landrith that was used in the information and jury instructions. The transcript of the trial uses the spelling "Landreth."

On August 22, 2007, in Defendant's 2007 assault and burglary case, the trial court ordered Defendant committed to the custody of the Department of Mental Health because the trial court found Defendant lacked mental fitness to proceed. The record is unclear, but it appears this finding was based on an undated report by Brian D. Petrovich, PsyD, who apparently evaluated Defendant on three days in May, June, and July 2007. Dr. Petrovich's report is not included in the record, but apparently it did not include an opinion on Defendant's mental fitness to proceed. It appears the report was submitted by Defendant's counsel.

In a report dated December 5, 2007 (reflecting an evaluation on November 28, 2007), licensed psychologist Jeffrey S. Kline with the Fulton State Hospital found that (1) Defendant "does not suffer from a mental disease or defect.... His past psychotic symptoms are a result of heavy drug use. Those symptoms are currently in full remission[,]" (2) Defendant "currently has the capacity to understand the proceedings against him ..., and is able to assist his attorney in his own defense[,]" and (3) Defendant "does not need to be held in a hospital facility pending further proceedings." Kline's diagnoses included (1) "cocaine-induced psychotic disorder, with hallucinations, in full remission," (2) "cocaine-induced psychotic disorder, with delusions, in full remission," (3) "cocaine dependence," and (4) "antisocial personality disorder." Kline's detailed findings included the following:

... there is no evidence that [Defendant] lacks the ability to understand the proceedings against him or lacks the capacity to assist in his own defense.
* * * *
There is a distinct possibility that [Defendant] has previously displayed delusional beliefs surrounding a number of issues including the legal system within Jasper County, and the sheriff's department. These delusions likely resulted from his heavy use of cocaine prior to his incarceration. His description of his cocaine use could very well lead to significant delusional beliefs which could linger for several weeks after discontinuation of the drugs. He currently no longer displays any of these delusional beliefs.

Currently, [Defendant] does not suffer any delusional beliefs. He does have overvalued ideas regarding several issues including some suspiciousness of corrections' staff and law enforcement in Jasper County. There is no evidence that these beliefs would interfere with his decision making with regards to his legal case.
* * * *
Evidence suggests that [Defendant] left the [Texas] Department of Corrections in 2006, and began heavy use of crack cocaine and other substances during an approximate nine month period. He describes numerous binge uses of crack cocaine where he would stay high for several days at a time and not sleep for up to seven or eight days straight. He reported during these time frames significant paranoia and the belief that he was being followed and monitored, which were clearly delusional beliefs. He also described sensations which are likely auditory and visual hallucinations during these same time frames. There is some evidence to suggest that these symptoms have lingered for weeks after his arrest and discontinuation of the crack cocaine. It is clear that while [Defendant] suffered from psychotic symptoms in the past, he no longer suffers any symptoms of a psychotic disorder, and while he has some strong beliefs about certain issues, these are not delusional

and, therefore, he is currently in full remission. It should be noted that his full remission status is without the use of any antipsychotic medication.

\* \* \* \*

A review of available evidence does not suggest that [Defendant] has any difficulty understanding the legal proceedings. . . .

There is also no indication that [Defendant] lacks the capacity to assist in his own defense. At times he may be somewhat difficult in his interactions with his attorney when things do not go his way, but this is the result of his personality disorder and not a result of any form of underlying delusional belief system or other psychotic symptomatology. His decision making does not appear to be the result of any form of psychotic symptoms, but likely the result of his personality disorder and his current situation.

[Defendant] is using medication to help with mood stability and to decrease aggressive acting out. This medication may or may not have helped his behavior while in the hospital. He has had a slight decrease in recent aggressive acting out. There is no indication though that further inpatient treatment is necessary to maintain [Defendant's] competency at this point in time.

Based on Kline's report and the fact that Defendant did not contest the findings in the report or request a second examination, the trial court, in his 2007 assault and burglary case, found that Defendant was mentally fit to proceed in an order filed January 17, 2008.[3]

Meanwhile, in the instant case, Defendant appeared in court on September 20, 2006, and indicated he would retain an attorney. Reappearance was scheduled for October 11, 2006. Defendant appeared on that date, but did so without an attorney. The State Public Defender's Office was appointed to represent him, and reappearance was scheduled for November 1, 2006.

Defendant did not appear on November 1, but appeared on November 8, 2006, and reappearance was scheduled for November 22, 2006. Defendant did not appear on November 22, and Defendant's attorney requested a continuance to November 29, 2006.

Defendant appeared on November 29, and a preliminary hearing was scheduled for December 20, 2006. On that date, Defendant waived his preliminary hearing, and an appearance for arraignment was scheduled in the circuit court on December 29, 2006. The State filed an information on December 27, 2006.[4] The trial court canceled the December 29 appearance and arraignment and reset it for January 26, 2007. On that date, Defendant was arraigned, and trial was set for July 9, 2007.

In June 2007, on its own motion, the trial court reset the trial for November 5, 2007. In November 2007, on its own motion, the trial court reset the trial for February 4, 2008. In January and February 2008, on its own motion, the trial court reset the trial for May 5, 2008.

Defendant's trial defense counsel entered his appearance in the case on April 8, 2008.[5]

---

3. On December 12, 2008, these assault and burglary charges against Defendant were dismissed by the trial court in that case following its grant of Defendant's motion to suppress a witness' identification of Defendant.

4. The State subsequently amended the information on July 10, 2009. The only change was to add allegations that Defendant was a prior and a persistent offender.

5. Before this date, Defendant was represented by the State Public Defender's Office.

On April 9, 2008, the trial court reset the trial for July 21, 2008. In June 2008, the trial court reset the trial for November 17, 2008.

At a motion hearing on November 14, 2008, defense counsel orally announced that "we are going to be using the defense of diminished capacity, involuntary addiction, as a defense in this matter and that we will be endorsing the [expert] who did Mr. Smith's psychological evaluation at Fulton State Hospital."

On November 17, 2008, the trial court canceled the trial scheduled for that day.

On December 2, 2008, defense counsel filed a motion for an examination for diminished capacity and a motion to dismiss for violation of Defendant's statutory and constitutional rights to a speedy trial.

At a motion hearing on December 12, 2008, defense counsel noted that he "was confused" and intended to give notice that Defendant intended to rely on the defense of not guilty by reason of insanity rather than diminished capacity. During that hearing, the trial court overruled Defendant's motion to dismiss for speedy-trial violations. In doing so, the trial court noted two hearing continuances requested by defense counsel in April 2008, and also stated:

We've had numerous trial settings. If the defense had asked for a number one trial setting I believe I'd of given you one. Now that I see this written motion, I've given you the next available number one setting we have so that if the case is not disposed of before then there's nothing ahead of it to be tried on those dates.

The number one setting referred to by the trial court was either July 13 or 27, 2009.

Four days after the dismissal of Defendant's 2007 assault and burglary charges on December 12, 2008, the trial court reset Defendant's bond in this case from a $75,000 surety bond to a "$300,000 cash only" bond. Defendant filed a motion for bond reduction or reinstatement on January 20, 2009. At a motion hearing on January 23, 2009, the trial court denied Defendant's motion for a bond reduction or reinstatement. Defense counsel explained that the purpose of the request for a bond reduction or reinstatement was to permit Defendant to travel to Oklahoma to address and hopefully "clear[ ]up" criminal charges there. After the trial court overruled the motion, Defendant, who had not been placed under oath, expounded upon defense counsel's statements and told the trial court the following. Defendant posted his $75,000 surety bond in this case and appeared at his hearings in this case until he was taken into custody on his 2007 assault and burglary charges. At the time of the hearing, he had been in custody twenty-two months. According to Defendant's then counsel, the State initially offered "a deal of ten years OCC" to resolve the charges in this case. Defendant rejected this offer but waived his preliminary hearing in exchange for the plea offer being "left on the table" until trial. The plea offer subsequently was withdrawn because of his 2007 assault and burglary charges and his pending criminal charges in Oklahoma. Defendant now wanted to accept the plea offer. In light of the recent dismissal of his 2007 assault and burglary charges, Defendant felt he should be allowed to accept the plea offer if he was able to resolve his pending Oklahoma charges. In order to resolve his pending Oklahoma charges, Defendant needed to travel to Oklahoma, and, in order to travel to Oklahoma, Defendant needed his bond in this case reduced or reinstated. Defendant's counsel then made an oral motion to reinstate Defendant's preliminary hearing because Defendant did not receive the benefit of his bargain—i.e., Defendant

waived his preliminary hearing, but the plea offer was withdrawn and no longer on the table. Defense counsel acknowledged that he had done "extensive research" but "was unable to find any case law nor statutes" to support the oral motion. Defendant, who remained unsworn, again expounded on defense counsel's remarks and provided much the same information as earlier in the hearing. The trial court overruled the motion to reinstate Defendant's preliminary hearing. Finally, defense counsel orally amended his motion for an examination for diminished capacity to allege "voluntary drug condition" with "psychosis," rather than "involuntary . . . intoxicated or drugged condition."

At a scheduled motion hearing on March 6, 2009, Defendant's counsel requested a continuance of the hearing to April 24, 2009, stating, "I have been down and tried to discuss this case with my client, but he seems incoherent at this time. And so I'm at a loss of what to do but ask for a continuance." The trial court granted defense counsel's request for a continuance. From the transcript of the March 6 hearing, it appears Defendant was not present in the courtroom during the hearing. The transcript of the April 24 hearing indicates Defendant was not present at the March 6 hearing at the request of trial defense counsel.

At the April 24, 2009, motion hearing, Defendant's counsel orally requested to amend his motion for an examination for diminished capacity to request that Defendant be evaluated under section 552.020 for lack of capacity to understand the proceedings and assist in his own defense, alleging "[b]asically my client appears to suffer from mental disease and defect and doesn't—he's not able to understand the nature of the proceedings and he has been demonstrating bizarre and inappropriate behavior in my presence." In response to the trial court's question, "Is there any further evidence or argument you wish to submit[,]" defense counsel added:

Just, Your Honor, without going into what all goes on between attorney and their client, my client is just—I mean, he has the inability to focus on things. It's everything is a conspiracy, everyone is out to get him. I mean, it just goes on and on and on, Your Honor. And he's progressively gotten worse, Your Honor.

The State argued that there was "no evidence before the Court to allow such a finding." The trial court overruled the amended motion after noting (1) a sergeant with the Sheriff's Department "mentioned" to the trial court later on March 6, 2009, that the sergeant "had not noticed anything different about [Defendant][,]" and (2) Defendant had been examined on November 28, 2007, and was found competent to proceed in the case involving his 2007 assault and burglary charges, including a diagnosis of "cocaine induced psychotic disorder with hallucinations in full remission," and then concluding, "I don't find a factual basis for ordering another evaluation and another report under [s]ection 552.020."

Immediately thereafter, defense counsel noted that Defendant was not receiving any medication at the jail even though he was receiving medication at Fulton. Defendant, who was not under oath, then interjected:

The jail denied me, wouldn't give it to me. When I came back from the State Hospital they placed me on medication when I was there, but the jail wouldn't give me anything when I came back. And I haven't been on any meds the entire time that I've been at the jail.

The trial court then added:

My recollection as to the defendant's demeanor in all hearings in both of these

cases in this Court [i.e., the instant case and 2007 assault and burglary case] is that he has appeared competent, very focused on what he wanted heard on each court date, on what he wanted his attorney to do.

At a motion hearing on June 26, 2009, defense counsel presented argument on Defendant's written motion to sever the two counts charged in this case. Defense counsel argued that the two counts charge separate crimes with different victims and should be severed to avoid prejudice, even though both crimes are alleged to be robberies that occurred on the same day. After hearing argument from the State and noting that Defendant's request for severance "to a certain extent ... cuts against your request for a speedy trial," the trial court concluded that it did not "find a legal basis to sever the counts" and overruled Defendant's motion to sever.

### Trial

A jury trial occurred on July 13, 2009. We provide only a brief summary of the facts, as Defendant does not challenge the sufficiency of the evidence. *See State v. Williams,* 247 S.W.3d 144, 147 (Mo.App. 2008). Viewed in the light most favorable to the jury's verdicts, *see State v. Shore,* 344 S.W.3d 292, 294 (Mo.App.2011), the evidence at trial established the following facts.

### Landrith Robbery

On August 29 and 30, 2006, Defendant, Defendant's brother, and two other men worked trimming trees at Twyla Landrith's home on 16th, about one-half block off Rangeline Road in Joplin. At that time, Landrith had lived at the home more than forty-five years. Defendant's brother and the two other men also worked at Landrith's home on August 31, but Defendant did not.

In the morning on September 1, 2006, Defendant went to Landrith's home and told her he was there to give her a written statement itemizing the men's work that she had paid for. In the course of preparing the written statement, Defendant asked Landrith for a drink of water. Landrith went into the kitchen and started to fix a glass of ice water. As she was doing so, Defendant approached Landrith from behind and placed her in a bear hug that immobilized her. Defendant then asked where Landrith kept her purse, forced Landrith to move with him to retrieve the purse, then forced Landrith to move with him to Landrith's bedroom, and, on arriving in Landrith's bedroom, told Landrith to get down on the floor and to stay there and not move. Landrith heard Defendant get into her purse and later heard the front door open and close. When she reached her front door and opened it, Landrith observed Defendant near Rangeline Road. Landrith then called 911 and later discovered that $200 was missing from her purse. After the robbery, Defendant "spent money on narcotics."

### Souder Robbery

That same day, in the late afternoon or early evening on September 1, 2006, Defendant approached Charles Souder's home on Rustwood Drive in Joplin. Defendant indicated that he needed fuel. Souder took Defendant to a nearby filling station. Defendant told Souder that he did not have any money but would be back in the area in the near future, so Souder purchased a little more than $7.00 of fuel for Defendant, with the understanding that Defendant would pay him back when he was back in the area.

A short time after returning to his home, Souder saw Defendant returning to Souder's house. At Defendant's request, Souder then agreed to take Defendant to a

nearby McDonald's to meet Defendant's girlfriend. Souder was driving his maroon Mini Cooper. About halfway to the McDonald's, Souder felt Defendant press a knife to Souder's neck. Defendant demanded Souder's wallet. Souder refused to give Defendant his wallet, but removed $93.00 from his wallet and gave the money to Defendant. Defendant then demanded Souder's car. Souder complied and exited his car. Defendant then drove off in the car. Souder went to a nearby house and called the police.

Shortly afterward, Joplin police officers observed Defendant driving Souder's Mini Cooper. Following a vehicle chase and subsequent foot chase, the officers arrested Defendant. Defendant had a "folding knife" on his person at the time of his arrest.

In a post-arrest, *post-Miranda*[6] interview by Joplin police detective Jason Shanault later that evening, Defendant admitted that "he had gone to [Landrith's] house knowing that he was going to rob her of her money," and that he took "between $100 and $200" from Landrith." Defendant also admitted that "while he was riding in [Souder's] vehicle he pulled a knife on [Souder] and had him pull over to the side of the road" and then "asked [Souder] for his wallet"; "[Souder] had given him the money and then [Defendant] . . . drove off in [Souder's] vehicle."

The instructions to the jury specifically instructed the jury that Defendant "is charged with a separate offense in each of the two counts submitted to you. Each count must be considered separately. You should return a separate verdict for each count[.]" In the early evening on July 13, 2009, the jury found Defendant guilty of both robberies.

### Initial Sentencing on July 13, 2009

Following the return of the jury's verdicts, Defendant requested to proceed to sentencing that evening. The trial court sentenced Defendant as a prior and persistent offender to thirty years in prison on each robbery charge and ordered that the sentences run concurrently.

### Defendant's Conduct during Trial and Initial Sentencing

The record reflects that Defendant actively and rationally participated in each phase of his trial and initial sentencing and consulted with defense counsel throughout the trial and initial sentencing. For example, during *voir dire*, Defendant personally participated in questioning a venire person and personally addressed the trial court. During trial, defense counsel took time to consult with Defendant regarding the end of counsel's cross-examination of three of the four witnesses called by the State in its case-in-chief and then frequently asked additional relevant questions. Defense counsel also took time after the State closed its case-in-chief to consult with Defendant and then announced that Defendant would testify and requested permission for Defendant to show the jury the tattoos on his upper torso during his testimony. Defendant testified at length at trial. Although the jury did not believe Defendant, Defendant's testimony was rational and was relevant to the factual issues in the case. After consulting with Defendant following the jury's guilty verdicts, defense counsel announced that Defendant requested to proceed to sentencing that evening. Defendant then personally confirmed that he wanted to testify on sentencing issues, and he testified at length. Although the trial court was not persuaded, Defendant's testimony was rational and relevant to sentencing. Defendant chose the topics for

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

his testimony at sentencing with little input from defense counsel, and, on cross-examination, when Defendant realized he had forgotten to tell the trial court about his personal history, he requested an opportunity to do so. Defendant also requested that Detective Shanault be called as a witness at sentencing. Detective Shanault's testimony was relevant to sentencing and helpful to Defendant's request at sentencing for "alternative punishment" because Defendant was addicted to drugs and needed help.

Immediately following sentencing, Defendant noted in response to questions from the trial court that "there's a lot of things that could have been done differently," and also indicated that Landrith and Souder should have been deposed sooner than they were.

At no time on the day of trial and initial sentencing, nor in the days immediately before or after that day, did defense counsel indicate to the trial court that counsel was having difficulty communicating with Defendant, that Defendant was having difficulty understanding the proceedings, or that Defendant was acting irrationally.

### Initial Appeal

On July 30, 2009, the State Public Defender's Office was appointed to represent Defendant on appeal. Defendant appealed from the judgment, and, on November 13, 2009, this Court dismissed the appeal and remanded to the trial court in order to give Defendant an opportunity to file or waive a motion for new trial and, if waived or denied, to be resentenced. Our mandate issued December 1, 2009.

### Re-sentencing on November 5, 2010

Defendant filed a motion for judgment of acquittal or, in the alternative, new trial on December 7, 2009, and the trial court scheduled the motion and, if denied, sentencing for January 15, 2010.

On January 4, 2010, the assistant public defender representing Defendant filed a motion requesting that Defendant be examined under section 552.020 for mental fitness to proceed. The trial court granted the motion, and, on March 24, 2010, found that Defendant lacked the mental fitness to proceed at that time.

Defendant retained an attorney who entered his appearance in the case on July 8, 2010, and the trial court granted the public defender's office permission to withdraw.

On August 11, 2010, the trial court found Defendant mentally fit to proceed based on a report dated July 1, 2010. The report noted that Defendant "was not prescribed antipsychotic medication" and "is not being treated for a significant mental illness," and found that Defendant "does not need to be held in a hospital facility pending further proceedings."

On November 5, 2010, the trial court overruled Defendant's motion for judgment of acquittal or, in the alternative, new trial after hearing extensive argument. In overruling the motion, the trial court referenced the Fulton State Hospital report, dated December 5, 2007, which found Defendant mentally fit to proceed, and the report's findings that "there is a distinct possibility" Defendant "previously displayed delusional beliefs," "[t]hese delusions likely resulted from [his] heavy use of cocaine ... prior to his incarceration," and that Defendant "no longer displays any of these delusional beliefs." The trial court then stated:

The Court observed defendant's demeanor during the multiple motion hearings in this case and at trial and the Court did not at anytime during any of the motion hearings or at anytime during the jury trial have any inkling of any

question as to whether the defendant was unfit to proceed mentally.

It is my job to do justice. I believe defendant had a fair trial. I carefully observed his many interactions with his attorney. [Defendant] could sometimes be a person with a very strong personality. He clearly communicated with [trial defense counsel] during motion hearings and during the course of the jury trial. [Defendant] elected to testify at trial and the jury elected not to believe him.

Although I don't believe it appears on the record at any point, after the jury convicted [Defendant] on both counts he then elected off the record to apologize to the jury when he decided he wanted to be sentenced that day. I don't have a shadow of a doubt and I truly believe that the defendant was competent to proceed at the time of his trial and that the jury verdict in this case should stand.

The trial court then heard evidence and argument relevant to sentencing and again sentenced Defendant as a prior and persistent offender to thirty years in prison on each robbery, ordering that the sentences run concurrently.

Defendant appealed. In the course of the appeal, retained counsel withdrew, and this Court appointed the State Public Defender's Office to represent Defendant.

### Discussion

Defendant raises four points of alleged trial court error. We address them in the order presented.

### Point I—Trial court's denial of Defendant's motion for new trial based upon Defendant's oral pretrial request for a mental-competency examination was not an abuse of discretion

In his first point, Defendant contends that the trial court erred in denying his "motion for new trial on the basis of its refusal to order an evaluation of [Defendant's] competence to proceed to trial" on April 24, 2009. Defendant argues that (1) the trial court's determination in August 2007 that Defendant lacked mental fitness to proceed to trial in his 2007 assault and burglary case (before the trial court found him mentally fit to proceed in that case in January 2008), (2) defense counsel's and Defendant's unsworn representations to the trial court at hearings in March and April 2009, and (3) the trial court's determination in March 2010 that Defendant lacked mental fitness to proceed to sentencing in this case (before the trial court found him mentally fit to proceed in August 2010) are "strong indicators that [Defendant] was not competent at trial, either, and that the court should have ordered the requested evaluation." We disagree.

### Legal Principles and Standard of Review

 Section 552.020.1 states that "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."

"The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *State v. Tokar*, 918 S.W.2d 753, 762 (Mo. banc 1996) (quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). A defendant is presumed competent to stand trial, and the burden is on the defendant to show he is incompe-

tent. *Edwards v. State*, 200 S.W.3d 500, 519 (Mo. banc 2006).

*Zink v. State*, 278 S.W.3d 170, 183 (Mo. banc 2009).

■ Section 552.020.2 provides that "[w]henever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall" order the accused examined. Although Defendant does not challenge the initial denial of his oral motion for a competency examination on April 24, 2009, we note that

> [w]here a motion [for a competency examination pursuant to section 552.020.2] has been presented to the court, the trial court has broad discretion in denying a defendant's motion for an exam, and is not a mere "automaton" to grant such motions just because they have been filed. *U.S. v. McEachern*, 465 F.2d 833, 837 (5th Cir.1972); *State v. Bolden*, ... 671 S.W.2d [418,] 419 [ (Mo.App.1984) ].

*Woods v. State*, 994 S.W.2d 32, 37 (Mo. App.1999); *see also State v. Messenheimer*, 817 S.W.2d 273, 276, 278 (Mo.App.1991) ("a trial court is vested with broad discretion in regard to ordering a mental examination."). "That discretion ... is abused when 'a reasonable judge in the same situation as the trial judge, should have experienced doubt as to the accused's competency.'" *State v. Yeager*, 95 S.W.3d 176, 179 (Mo.App.2003) (quoting *Woods*, 994 S.W.2d at 37).

■ "While the [trial] court may consider [counsel's own observations and] statements regarding a client's mental state," *Yeager*, 95 S.W.3d at 180,[7] counsel's observations and statements alone do not provide reasonable cause to believe the defen-

dant lacks mental fitness to proceed. *See State v. Williams*, 247 S.W.3d 144, 147–50 (Mo.App.2008); *Yeager*, 95 S.W.3d at 180; *State v. Tilden*, 988 S.W.2d 568, 578 n. 2 (Mo.App.1999); *Guinan v. State*, 726 S.W.2d 754, 756–57 (Mo.App.1986) ("[t]he mere filing of a motion ... and counsel's naked assertion that the accused is incompetent does not provide the trial court with reasonable cause").

■■ A challenge to a trial court's denial of a motion for new trial is reviewed for an abuse of discretion. *See State v. Shore*, 344 S.W.3d 292, 298 (Mo.App.2011). The trial court abuses its discretion when its ruling is clearly against the logic of the existing circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

*Analysis*

■ We begin our analysis of the trial court's denial of Defendant's motion for new trial based upon the trial court's denial of his oral request for a competency examination on April 24, 2009, with the information available to the trial court as of that date. It included the following. A detailed psychological report dated December 5, 2007, filed in Defendant's 2007 assault and burglary case, concluded that (1) Defendant was mentally fit to proceed, (2) Defendant may have suffered cocaine-induced hallucinations and delusions in the past, (3) Defendant no longer suffers psychotic symptoms, (4) the remission of Defendant's hallucinations and delusions occurred without the use of antipsychotic medications, and (5) Defendant no longer

---

7. *See also Drope v. Missouri*, 420 U.S. 162, 177 n. 13, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client," an "expressed doubt in that regard" by counsel "is unquestionably a factor which should be considered." (citations omitted)).

needed to be hospitalized. On the basis of that report and the fact Defendant did not contest the report or request a second report, the trial court, in January 2008, found Defendant mentally fit to proceed in the 2007 assault and burglary case. The trial court also had observed Defendant in a number of hearings (including the April 24, 2009, hearing) and found that Defendant "has appeared competent, very focused on what he wanted heard on each court date, on what he wanted his attorney to do."

The only contrary information available to the trial court on April 24, 2009, was defense counsel's unsworn statements as to Defendant's mental health and defense counsel's and Defendant's unsworn statements that Defendant was not receiving prescribed medication at the Jasper County jail. The trial court gave Defendant an opportunity to present evidence on this issue, which he and his defense counsel declined.

On this record, defense counsel's and Defendant's statements, standing alone, are insufficient to establish that a reasonable judge should have experienced doubt as to Defendant's competency on April 24, 2009. *Williams,* 247 S.W.3d at 147–50; *Yeager,* 95 S.W.3d at 180; *Guinan,* 726 S.W.2d at 756–57. The trial court did not initially abuse its discretion in denying Defendant's April 24, 2009, oral request for a competency examination.

As to information acquired by the trial court after its initial denial of the motion for mental examination on April 24, 2009, and the denial of Defendant's motion for new trial on November 5, 2010, the Defendant points solely to the trial court's later determination that he was incompetent to proceed on March 24, 2010. That determination, however, must be considered within the context of the entire case record and the totality of the circumstances before the

trial court at the time it ruled on the motion for new trial. In other words, the trial court's determination in March 2010 that Defendant lacked mental fitness to proceed does not, standing alone, necessarily undermine the trial court's April 24, 2009, denial of Defendant's request for a competency examination or its later denial of Defendant's motion for new trial. If that were so, then once a defendant was determined to be incompetent to proceed, he could never thereafter be found to be competent to proceed.

The trial court's initial denial of Defendant's motion for a competency examination was bolstered by the following information that was acquired by the trial court before ruling on Defendant's motion for new trial. Defendant's trial and initial sentencing occurred on July 13, 2009. Defendant testified at both. The transcript of the trial and initial sentencing demonstrate that Defendant's testimony was responsive to the questions asked, relevant, and rational. In addition, Defendant's strategy at the initial sentencing largely appeared to be directed by Defendant and remained relevant to sentencing and rational. The trial court acknowledged its observations of both during the hearing on Defendant's motion for new trial. Consistent with those observations, defense counsel never again raised the issue of Defendant's competency between April 24, 2009, and the initial sentencing at the conclusion of the trial on July 13, 2009.

The issue of Defendant's competency to proceed was not raised again until Defendant's appellate counsel requested a competency examination in January 2010. That request led to the trial court's March 2010 determination. Thereafter, Defendant again recovered his competency to proceed without the use of anti-psychotic medication and subsequently was found competent to proceed in August 2010.

The trial court had the opportunity to observe Defendant many times through the years when it was assigned to this case and Defendant's 2007 assault and burglary case until November 5, 2010, when it ruled on Defendant's motion for new trial. These observations occurred both during times when Defendant was determined to be competent to proceed and when he was determined to be incompetent to proceed. These observations were factors the trial court was entitled to consider in exercising its discretion in ruling on Defendant's motion for new trial. *See Williams*, 247 S.W.3d at 148–149 (trial court may rely upon personal observation to determine whether or not reasonable cause exists for ordering mental competency examination). The later period of incompetency to proceed occurred long after April 24, 2009, and Defendant's trial and initial sentencing on July 13, 2009, and do not support reasonable cause to believe Defendant lacked mental fitness to proceed either on April 24 or July 13, 2009, or that the trial court's denial of Defendant's motion for new trial on this basis was clearly against the logic of the existing circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.

Finding no abuse of discretion by the trial court in denying Defendant's motion for new trial based upon its denial of Defendant's oral motion for a competency examination on April 24, 2009, Defendant's first point is denied.

### Point II—No improper joinder or abuse of discretion to deny severance

In his second point, Defendant claims that joinder of the two robbery charges was improper, or, if joinder was proper, the trial court's denial of his motion to sever was an abuse of discretion.

### Standard of Review

Our review of claims for improper joinder and failure to sever charges involves a two-step analysis. *State v. Holliday*, 231 S.W.3d 287, 292 (Mo.App. W.D.2007). First, we must determine whether joinder of the charges was proper as a matter of law. *State v. Simmons*, 270 S.W.3d 523, 528 (Mo.App. W.D.2008). If joinder was not proper, then prejudice is presumed from a joint trial and severance of the charges is mandatory. *Holliday*, 231 S.W.3d at 292. However, if joinder is deemed proper, this Court must then determine whether the trial court abused its discretion in denying Defendant's motion to sever. *Id.* "Severance assumes that joinder is proper, but gives discretion to the trial court to decide whether trying the charges together would result in substantial prejudice." *Id.* Once a finding is made that joinder is proper, the trial court's decision will not be reversed absent a showing of both an abuse of discretion and a clear showing of prejudice. *Simmons*, 270 S.W.3d at 528. The issue of whether joinder is proper is a question of law, while severance is within the trial court's discretion. *State v. Butchee*, 255 S.W.3d 548, 550 n. 6 (Mo.App. S.D.2008).

*State v. Love*, 293 S.W.3d 471, 475 (Mo.App.2009). "A trial court abuses its discretion if its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. McKinney*, 314 S.W.3d 339, 342 (Mo. banc 2010) (citation omitted).

### Analysis

### Joinder was proper

Offenses, "whether felonies or misdemeanors or infractions, or any com-

bination thereof," may be charged in the same indictment or information if the offenses "are of the same or similar character or based on two or more acts that are part of the same transaction or on two or more acts or transactions that are connected or that constitute parts of a common scheme or plan." Section 545.140.2. *See also* Rule 23.05.[8] "Connected" has its ordinary meaning and includes "united ... by dependence or relation, or by order in a series" and "joined or linked together [in] a series, having the parts or elements logically related[.]" *State v. McKinney,* 314 S.W.3d at 341–42 (citing dictionary definitions); *see also State v. McDonald,* 321 S.W.3d 313, 318–19 (Mo.App.2010) ("connected" includes "things that are joined or linked together in a series or that have logically related parts or elements"). "A common scheme or plan" requires that the offenses "be the product of a single or continuing motive." *State v. Morant,* 758 S.W.2d 110, 114 (Mo.App.1988).

A criminal defendant does not have a federal or state constitutional right to be tried on only one offense at a time. *Id.* at 113. Liberal joinder of criminal offenses is favored, *McKinney,* 314 S.W.3d at 341, and joinder is appropriate where any of the authorized bases for joinder exists, *McDonald,* 321 S.W.3d at 318. The propriety of joinder is fact dependent, and we consider only the State's evidence in determining whether joinder was proper. *Id.*

In this case, Defendant's two robberies were both connected and part of a common scheme or plan, and, as a result, were properly joined. The robberies were connected by time, place, motive, and logically related parts. The robberies were part of a one-person crime spree (two robberies, purchase of "narcotics," and flight from police) in Joplin that spanned less than twelve hours on a single day. The evidence showed that Defendant "spent money on narcotics" after he took $200.00 from Landrith in the morning. That same evidence supports the reasonable inference that Defendant's motive for the Landrith robbery was to obtain money for drugs, and, after spending Landrith's money, that same motive prompted Defendant to rob Souder and take $93.00 in the late afternoon or early evening that same day. The robberies also are logically related. The evidence that Defendant spent money on narcotics following his robbery of Landrith explains the motive for his robbery of Landrith and, in combination with the evidence of the small amount of money taken from Landrith, it also explains his subsequent robbery of Souder. In addition, Defendant's flight from police in the car he took from Souder is admissible evidence of his consciousness of guilt of both the Souder robbery and the earlier Landrith robbery. *See McKinney,* 314 S.W.3d at 341–42, n. 3 (evidence that flight was not motivated by consciousness of guilt goes to the weight and not the admissibility of the evidence); *Morant,* 758 S.W.2d at 114–15 (flight is evidence of guilt of past robberies as well as a more recent robbery that preceded the flight).

As explained above, the two robberies also can be considered as part of a common scheme or plan, in that both crimes were the product of a continuing motive-to obtain money for drugs.

For these reasons, joinder of the two robberies was proper.[9]

---

8. All references to rules are to Missouri Court Rules (2012).

9. The parties spend a good portion of their arguments on whether the two robberies were of the "same or similar character." Although it is unnecessary to decide this issue because we have found the two robberies to be connected and part of a common scheme or plan,

### Severance was not required

Under section 545.885 and Rule 24.07, offenses charged in the same charging document "shall" be tried together unless "(a) [a] party files a written motion requesting a separate trial of the offense; (b) [a] party makes a particularized showing of substantial prejudice if the offense is not tried separately; and (c) [t]he court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense." Section 545.885.2 further provides that " 'substantial prejudice' shall mean a bias or discrimination against the defendant or the state which is actually existing or real and not one which is merely imaginary, illusionary or nominal."

In determining whether actual prejudice exists when alleging an error with regard to the severance of charges, the court should consider, among other relevant factors, the number of offenses charged, the complexity of the evidence offered, and whether the trier of fact could realistically distinguish the evidence or apply the law to each offense. *State v. Conley*, 873 S.W.2d 233, 238 (Mo. banc 1994). "The mere fact that juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one does not call for severance." *[State v.] Bechhold*, 65 S.W.3d [591,] 596 [ (Mo.App.2002) ]. In addition, "the general allegation that the jury would likely consider evidence of guilt of one charge as evidence of guilt of another charge is not sufficient to show a particularized showing of substantial prejudice." *[State v.] Chambers*, 234 S.W.3d [501,] 509 [ (Mo.App.2007) ]. Severance is not mandated merely because evidence relating to one count would not be admissible in the trial of a second count were the two tried separately. *Conley*, 873 S.W.2d at 238. Where the evidence relating to each of the offenses is uncomplicated and distinct, and the jury is properly instructed to return separate verdicts for each offense charged, the trial court does not abuse its discretion in refusing to sever the counts. *Chambers*, 234 S.W.3d at 509.

*State v. Love*, 293 S.W.3d 471, 477 (Mo. App.2009); *see also State v. McDonald*, 321 S.W.3d 313, 320 (Mo.App.2010) (similar language).

In this case, Defendant's only claim of prejudice is that "the jury was likely to consider the evidence of each robbery against [Defendant] in considering whether he was involved in the other[,]" and "the evidence of each of the two incidents would have been inadmissible propensity evidence in a trial of the other, had they been tried separately." As explained above, these claims do not require severance. The State's evidence of each of the two robberies in this case was distinct and uncomplicated, and involved only four witnesses, two of whom were victims. The elements of the robberies were clearly set out in separate instructions for each robbery, and the jury was instructed that "[t]he defendant ... is charged with a separate offense in each of the two counts submitted to you. Each count must be considered separately. You should return a separate verdict for each count[.]"

Defendant fails to make a particularized showing of substantial prejudice, and the trial court's denial of Defendant's motion to sever was not clearly against the logic of

---

it is questionable whether the two robberies share sufficient similar tactics that the manner in which the robberies were committed makes it likely the same person committed both robberies, as required for the robberies to be of the same or similar character. *See State v. Saucy*, 164 S.W.3d 523, 528–29 (Mo. App.2005); *Love*, 293 S.W.3d at 475–76.

the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.[10] Defendant's second point is denied.

### Point III—No abuse of discretion in denial of motion to dismiss

Defendant's third point asserts the trial court erred in overruling his motion to dismiss the two robberies because of a violation of his constitutional right to a speedy trial.

#### Standard of Review

■ Appellate courts review a trial court's ruling on a motion to dismiss for abuse of discretion. *State v. Loewe*, 756 S.W.2d 177, 182 (Mo.App.1988). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Kleine*, 330 S.W.3d 805, 808 (Mo.App.2011). *State v. Scott*, 348 S.W.3d 788, 794 (Mo. App.2011).

#### Legal Principles

In *State v. Greenlee*, 327 S.W.3d 602, 611–13 (Mo.App.2010), the Eastern District of this Court provided a roadmap for a speedy-trial analysis:

A defendant's right to a speedy trial arises under the Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment. *State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 910–11 (Mo. banc 2010). The Missouri Consti-

tution provides equivalent protection for a defendant's right to a speedy trial. *State ex rel. McKee v. Riley*, 240 S.W.3d 720, 729 (Mo. banc 2007). Orderly expedition of a case, not mere speed, is the essential requirement behind a speedy trial. *State v. Bell*, 66 S.W.3d 157, 164 (Mo.App. S.D.2001). However, deprivation of the right to a speedy trial is not considered per se prejudicial to a defendant. *Id.*

The determination of whether there has been a violation of a defendant's constitutional speedy trial rights involves a balancing process. *Goldman*, 316 S.W.3d at 911. In analyzing whether a defendant's rights to a speedy trial have been violated, courts consider and balance all of the circumstances, and weigh four factors as set forth by the United States Supreme Court in *Barker v. Wingo*: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

Regarding the first factor, the length of the delay is a "triggering mechanism," in that until there is a delay considered to be presumptively prejudicial, there is no need to discuss the other three factors that are part of the balancing process. *Goldman*, 316 S.W.3d at 911. In Missouri, courts have determined that a delay of greater than eight months is presumptively prejudicial to the defendant. *Id., Riley*, 240 S.W.3d at 729.

* * * *

---

**10.** We also note without deciding that it is far from clear the evidence of one robbery would have been inadmissible in a separate trial of the other robbery. *See State v. Morrow*, 968 S.W.2d 100, 107, 108–09 (Mo. banc 1998)

(evidence of an uncharged crime is admissible to show "the complete and coherent picture" of a charged crime in the "sound discretion" of the trial court).

The second factor this Court must examine is the reason for the delay. "The burden is upon the [S]tate to accord an accused a speedy trial, and if there is delay it becomes incumbent upon the [S]tate to show reasons which justify that delay." *State v. Holmes*, 643 S.W.2d 282, 287 (Mo.App. W.D.1982). Different weights are assigned to different reasons for a delay. *Goldman*, 316 S.W.3d at 911. Delays deliberately intended to hamper the defense are weighed heavily against the State, however to the extent that any delays were due to the trial court's docket, those delays should be weighted less heavily against the State. *Riley*, 240 S.W.3d at 730; *State v. Drudge*, 296 S.W.3d 37, 43 (Mo.App. E.D.2009); *State v. Farris*, 877 S.W.2d 657, 660 (Mo.App. S.D.1994). Trial court related docket delays should nevertheless be considered because the ultimate responsibility for such circumstances must rest with the government rather than the defendant. *Riley*, 240 S.W.3d at 730; *Drudge*, 296 S.W.3d at 43. On the other hand, where a defendant has contributed to the delay by requesting, and being granted, continuances, he cannot later successfully allege the denial of his right to a speedy trial. *Farris*, 877 S.W.2d at 660. "Delays attributable to the defendant weigh heavily against the defendant." *Farris*, 877 S.W.2d at 660 (internal quotations omitted).

\* \* \* \*

The third factor to consider is whether the defendant asserted his right to a speedy trial.

\* \* \* \*

In Missouri, the fourth factor, prejudice to the defendant, is considered to be the most important of the four fac-

tors. *Drudge*, 296 S.W.3d at 43. "There are three considerations in determining whether a delay has prejudiced the defendant: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation on the possibility that the defense will be impaired." *Goldman*, 316 S.W.3d at 912. These three factors represent the interests of a defendant that the right to a speedy trial is intended to protect. *Id.* Of these three factors, courts regard the third, the possible impairment of the defense, as the most serious and important. *Id.* "The inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (internal quotations omitted). Claims of prejudice must be actual or apparent on the record, or by reasonable inference, while speculative or possible prejudice is not sufficient. *Drudge*, 296 S.W.3d at 43. Failure to present evidence of actual prejudice weighs heavily in favor of the State. *Id.*

\* \* \* \*

With regard to his mental state while incarcerated, anxiety alone does not establish prejudice absent the showing of specific instances that weighed heavily on the defendant. *State v. Joos*, 966 S.W.2d 349, 353 (Mo.App. S.D.1998).

\* \* \* \*

Finally, while Greenlee did spend an extended period of time incarcerated before his trial, we note that he was sentenced to life imprisonment as a result of his conviction. Thus, Greenlee has no claim that he has served additional jail time because of any delay in bringing him to trial. *See* [*State v. Joos*, 966 S.W.2d at 353].[11]

---

11. The constitutional right to a speedy trial also includes the right to a speedy accusation under the due process clause of the Fifth Amendment. *See State v. Scott*, 348 S.W.3d

 "In Sixth Amendment speedy-trial cases, the pertinent time period begins at arrest or indictment; that is, when a suspect officially becomes an accused. [*United States v.*] *Marion,* 404 U.S. [307,] 313, 92 S.Ct. 455, 30 L.Ed.2d 468 [(1971)]." *State v. Scott,* 348 S.W.3d 788, 794, 795 n. 4 (Mo.App.2011). In determining the length of the delay, any delays attributable to the defendant are excluded as is any period the defendant lacked mental fitness to proceed (at least where, as in this case, the defendant places his mental fitness to proceed in issue). *State v. Joos,* 966 S.W.2d 349, 352–53 (Mo.App.1998); *State v. Johnson,* 579 S.W.2d 771, 775–76 (Mo.App.1979). And, in evaluating the reason for the delay, the actions of a defendant's counsel are attributed to the defendant in analyzing the defendant's speedy-trial claim. *Scott,* 348 S.W.3d at 797 n. 5. Further, in evaluating the third *Barker* factor—i.e., whether the defendant asserted his right to a speedy trial—"[w]hen the defendant asserts his right later in the proceeding through a motion to dismiss rather than a motion for an immediate trial, his actions will be read to 'indicat[e] a desire to avoid trial rather than to have a speedy trial.' [*State v.*] *Nelson,* 719 S.W.2d [13,] 19 [(Mo.App. 1986)]." *Id.* at 797.

### Analysis

 We begin with the first *Barker* factor—length of delay. Even excluding all delays attributable to Defendant (ninety-one days from September 20 through December 20, 2006, were attributable to Defendant's failure to retain an attorney and failures to appear) and the period Defendant lacked mental fitness to proceed (148 days from August 22, 2007,

through January 17, 2008), the length of the delay between Defendant's arrest on September 1, 2006, and his trial on July 13, 2009, significantly exceeded eight months and was presumptively prejudicial. As a result, we proceed to evaluate the other three *Barker* factors.

As to the second factor, reason for the delay, Defendant does not allege, and there is no indication in the record, that any part of the delay not attributable to Defendant or his lack of mental fitness to proceed was intended to hamper Defendant's defense. It appears that this portion of the delay was attributable to trial court docket congestion and, as a result, weighs against the State, but not heavily.

In regard to the third factor, Defendant's assertion of his right to a speedy trial, Defendant did not assert his right to a speedy trial in this case until December 2008 and did so then by a motion to dismiss rather than a motion for a prompt trial setting. The trial court promptly set the case for trial on the next docket with an available number one setting and also noted, "We've had numerous trial settings. If the defense had asked for a number one trial setting I believe I'd [have] given you one." These facts cause us to believe Defendant's motion to dismiss reflected a desire to avoid trial rather than to obtain a speedy trial. This factor weighs against Defendant.

Prejudice to the defendant, the fourth and most important *Barker* factor, also weighs against Defendant and does so heavily because Defendant fails to meet his burden to show actual prejudice due to the delay in his trial.

Defendant's sole allegations of prejudice are:

788, 794 (Mo.App.2011). The Fifth Amendment is not involved in this case, as Defendant was arrested on the day the offenses in

question were committed and subsequently was promptly charged by complaint.

[Defendant] showed prejudice, in that he was in custody during practically the entire period of time in question, from April 1, 2007, until trial on July 13, 2009, a total of 834 days. In addition, the prosecutor argued that [Defendant] should not be believed, in part, because he did not produce his brother or any of the other alleged drug users he mentioned to testify in his behalf and support his alibi. . . . But the trial was nearly three years after the alleged crimes. It is no wonder that these people were not available to [Defendant].

These are general allegations and do not establish actual prejudice. Defendant does not allege, and there is no indication in the record, that his pre-trial incarceration was oppressive or resulted in specific instances that weighed heavily on Defendant and caused inordinate anxiety and concern. Most importantly, there is no evidence that Defendant's defense was impaired by the delay in his trial. Although Defendant references the fact he called no witnesses to support his alibi, Defendant points us to no evidence that a witness who could support his alibi in fact existed, and if the witness existed, what the witness would say or that the witness was in fact rendered unavailable by the delay in his trial. *See Greenlee,* 327 S.W.3d at 613.

Finally, Defendant's sentence greatly exceeded the length of his pretrial incarceration so that the delay in Defendant's trial did not result in Defendant serving more time in jail than his sentence.

The trial court's weighing of these factors so as to deny Defendant's motion to dismiss was not clearly against the logic of the circumstances before the court or so arbitrary and unreasonable as to shock the sense of justice or indicate a lack of careful consideration. Therefore, the trial court's denial was not an abuse of discretion. Defendant's third point is denied.

## Point IV—No error in denial of Defendant's request for a new preliminary hearing

In his fourth and last point, Defendant contends that the trial court erred in denying his oral request for a new preliminary hearing in January 2009, slightly less than six months before trial. According to Defendant's unsworn statements to the trial court in his oral motion, the State represented that a plea offer Defendant rejected would remain outstanding until trial in exchange for Defendant waiving a preliminary hearing. Defendant subsequently waived his preliminary hearing and asserts that, in doing so, he relied to his detriment on the State's representation. Again according to Defendant's unsworn statements to the trial court, following Defendant's waiver of a preliminary hearing, the State withdrew the plea offer because of Defendant's new criminal charges in Jasper County and pending criminal charges in Oklahoma. Defendant specifically notes that he "is not asking this Court to force the State to comply with the plea offer," but rather requests that he be restored to the position he was in before his waiver of a preliminary hearing—i.e., "that the case . . . be remanded for a preliminary hearing, and trial if probable cause is found." The State disputed the existence of a plea agreement as alleged by Defendant and its claimed breach.

### Analysis

At the time that Defendant made this oral motion, he had previously waived his right to a preliminary hearing. As the proponent of the motion for a new preliminary hearing seeking to challenge the status quo, Defendant had the burden of proving the factual allegations of his motion. *State v. Byrnes,* 238 Mo.App. 220, 177 S.W.2d 909, 910 (1944). On appeal,

Defendant's point presupposes that he carried that burden and that he established as a fact the existence of the alleged plea agreement and its subsequent breach by the State. Defendant, however, did not request an evidentiary hearing on his motion or otherwise present any evidence to the trial court supporting his allegations, but rather, he relied only upon his and defense counsel's unsworn and uncross-examined statements in the oral motion. Because defense counsel's and Defendant's bare assertions of fact do not prove themselves and are not evidence of the asserted facts, *State v. Merrick,* 257 S.W.3d 676, 680 (Mo.App.2008), the record is void as any evidentiary basis upon which the trial court could have granted Defendant's motion. In that context, the trial court could not have committed any error in denying it. Point denied.

Defendant's convictions are affirmed.

NANCY STEFFEN RAHMEYER, and WILLIAM W. FRANCIS, JR., JJ., concur.