Lisa White Hardwick, Judge
Derry L. Beck, II, appeals from his convictions of three counts of first-degree statutory sodomy and one count of first-degree child molestation. He contends the verdict directors did not ensure a unanimous verdict; the information was vague and failed to state an offense; the State's conduct and statements during closing arguments were improper; the court erroneously allowed an expert to opine that the victim was sexually abused; the court erroneously limited his ability to cross-examine the victim about sexual abuse perpetrated upon her by another person; and the court erroneously denied him a hearing on his *412 allegation of alleged juror misconduct. For reasons explained herein, we affirm, in part, and reverse and remand, in part.
FACTUAL AND PROCEDURAL HISTORY
Beck was the biological father of A.O., who was born on November 18, 2000, after Beck separated from A.O.'s mother. Beck did not acknowledge that A.O. was his daughter until DNA tests proved it when A.O. was four years old. A.O. lived with her mother.
Beck's primary residence was his mother's ("Grandmother") house in Blue Springs. At some point after the DNA test, A.O. began visiting Grandmother and Beck occasionally at Grandmother's house, but she did so less frequently than her older brother and sister, who were also Beck's children. After A.O. visited Beck, she never wanted to talk with her mother about the visit.
When A.O. was five or six years old and in preschool or kindergarten, she was sleeping in the bedroom she usually slept in at Grandmother's house while Beck was on the computer in that room. A.O. saw that Beck was "looking at pictures of women on the Internet." He told A.O. to come over to him. Beck pulled down her pants, put his hands on her hips, and put his penis in her anus. He then put his penis in her mouth, his hands on her head, and told her to "suck it like a lollipop." Beck told A.O., "This will be our little secret." A.O. thought Beck was a "scary guy."
Afterwards, A.O. walked to the bathroom, where she encountered Grandmother. Grandmother asked A.O. what Beck was doing. A.O. told Grandmother that Beck was looking at pictures of naked women on the Internet. Grandmother did nothing. A.O. believed that, even if Grandmother had known what Beck was doing, Grandmother would have allowed it to continue.
Beck anally sodomized A.O. on five or six occasions. Beck also continued to make her perform oral sex on him, "more [times] than [she] can count." Some of the sexual abuse occurred when she was alone in her bedroom, while other incidents occurred when A.O. was sleeping in her sister's room, while her sister was either sleeping or was not there. On one occasion, A.O.'s little brother, who was one or two years old at the time, was watching television with A.O. in her bedroom when Beck came in and anally sodomized her. On another occasion, when A.O. was sleeping in her sister's room without her sister there, Beck came in the room around 2:00 a.m. A.O. tried to wrap herself in her covers, but Beck anally sodomized her.
When A.O. was eleven years old and her grandfather was visiting, she was sleeping in a bedroom in the basement when Beck came downstairs. He made her perform oral sex on him, anally sodomized her, and tried to put his penis in her vagina, but she struggled and was able to stop him.
On another occasion, when A.O. was eleven or twelve years old, in the fifth grade, and was sleeping in her sister's room without her sister there, Beck made her perform oral sex on him, anally sodomized her, placed his fingers in her vagina, placed his mouth on and licked her vagina, and then placed his penis against her vagina and tried to put his penis in her vagina. Just the tip of Beck's penis went inside her vagina because A.O. struggled and "wouldn't let him." Beck asked her if she was a virgin. A.O. told him that she was a virgin and that she hated him.
Beck sexually abused A.O. for the last time when she was twelve or thirteen years old. A.O. made a tentative disclosure of the abuse, although not in detail, to her closest friend at that time.
*413 Several years after the abuse stopped, Beck asked A.O. to go out to dinner with him to celebrate her fifteenth birthday. A.O.'s sister encouraged her to go, so A.O. went because she did not want to "seem weird about it." During the dinner, Beck apologized to her and asked if she could ever forgive him for what he had done.
A.O. later disclosed the sexual abuse to her cousin, but A.O. made her cousin promise not to tell anyone. When A.O. was telling her cousin about the abuse, she seemed "distant, like emotionless almost," which was contrary to her usually happy and bubbly personality. A.O.'s cousin agreed not to tell anyone, but she knew it was not right to keep it to herself so she told a trusted teacher and a school counselor.
An investigator from Children's Division contacted A.O.'s mother and told her about A.O.'s statement that Beck had sexually abused her. A.O. then told her mother and sister about the abuse. A.O.'s sister, who was living with Beck at Grandmother's house at the time, immediately moved out.
A.O.'s mother went to the police station and filed a police report. The police requested that A.O. participate in a forensic interview at Child Protection Center ("CPC"). During the interview, which was videotaped, A.O. described several acts of sexual abuse that Beck committed against her over the years at Grandmother's house.
A.O. was taken to Children's Mercy Hospital, where she underwent testing for sexually-transmitted diseases and a physical exam by Emily Killough, M.D., a doctor specially trained in child sexual abuse. Before examining A.O., Killough reviewed A.O.'s forensic interview summary, met with A.O. and a family member who was with her, and obtained A.O.'s medical history. Killough found that A.O.'s physical exam was normal. According to Killough, in the vast majority of child sexual abuse cases where the abuse occurred several years before it was reported, the physical exam is normal because the mucosal tissue in the anogenital area heals quickly and stretches easily and, if there were any bruising, redness, or abrasions, they would be gone by the time of the exam. Therefore, according to Killough, the expected finding in a child sexual abuse case is a normal physical exam. Based upon A.O.'s history, including her disclosure of abuse, and the physical exam, Killough diagnosed A.O. with child sexual abuse.
The police arrested Beck. Following his arrest, Beck waived his Miranda rights and gave a brief statement to a detective. The interview was short because the officer smelled alcohol on Beck.
The State initially charged Beck with three counts of first-degree statutory sodomy and one count of first-degree child molestation. In each count, the State alleged that the acts occurred "on or between November 18, 2005 and November 17, 2014," which was when A.O. was between the ages of five and thirteen. Prior to trial, the State filed an amended information alleging that the act referenced in the first count of statutory sodomy, which was Beck's placing his genitals in A.O.'s anus, occurred "on or between November 18, 2005 and November 17, 2012," which was when A.O. was between the ages of five and eleven. The dates for the acts referenced in the other counts remained the same. At the close of all the evidence at trial, the State filed a second amended information alleging that the acts referenced in all four counts occurred "on or between November 18, 2005 and November 17, 2012."
During the jury trial, Beck testified in his defense. He admitted that he did not acknowledge A.O. to be his daughter prior *414 to the DNA test, and he admitted that he told A.O. that he did not like her. Beck denied ever sexually abusing A.O. Beck claimed that his apology to A.O. during her fifteenth birthday dinner was for his telling her that he did not like her and not for his having sexually abused her.
Beck testified that he was either out of the state or the country for significant periods of time between November 2005 and November 2012. Specifically, Beck testified that, in 2005, he was in Arizona during November and December; in 2006, he lived with Grandmother only during the months of January and February and was "on vacation" for the rest of the year; in 2007, he was in dive school in Florida from March to October; in 2008, he worked for six months as a diver in Louisiana and then three months in Guam before he got sick with tuberculosis and was hospitalized for two months; in 2009, he worked as a diver in Louisiana, Guam, and Costa Rica from January until July or August; in 2010, he worked in Alabama on the BP oil spill in April and was gone for six months; and in 2011, he worked in Louisiana from January through August.
Beck brought in some of his dive logs to support his testimony about where he was for a few of these time periods. Although he claimed to have records to support where he was for all of the time periods to which he testified, Beck did not bring those records to court. Moreover, Beck admitted that that there were several periods between November 2005 and November 2012 when he was staying at Grandmother's house and A.O. was there. Beck also admitted that he did not tell the police during his initial interview after his arrest that he was out of the state and the country for periods of time between November 2005 and November 2012.
The jury found Beck guilty on all counts. The court sentenced him to concurrent terms of twenty years in prison for each of the three first-degree statutory sodomy counts and fifteen years in prison for first-degree child molestation. Beck appeals.
ANALYSIS
Point I-Jury Instructions
In Point I, Beck contends the circuit court erred in submitting the verdict directors for all four charges. He argues that there was evidence of multiple acts pertaining to each count of the second amended information, but the verdict directors failed to specify a particular incident. He asserts that, by failing to specify a particular incident, the instructions did not ensure a unanimous jury verdict. Beck concedes that he failed to object to the instructions at trial. Therefore, review is for plain error only.
Pursuant to Rule 30.20, this court has discretion to review "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "For instructional error to constitute plain error, the defendant must demonstrate the trial court so misdirected or failed to instruct the jury that the error affected the jury's verdict." State v. Celis-Garcia , 344 S.W.3d 150, 154 (Mo. banc 2011) (internal quotation marks and citations omitted).
Article I, section 22(a) of the Missouri Constitution protects the right to a unanimous jury verdict. Id. at 155. "For a jury verdict to be unanimous, 'the jurors [must] be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt.' " Id. (citations omitted). The issue of jury unanimity may be implicated in "multiple acts" cases. Id. "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged *415 with those acts in a single count." Id. at 155-56.
In Celis-Garcia , the Court held that a defendant's right to a unanimous jury verdict was violated when the verdict directors failed to separately identify specific instances of sodomy. Id. at 159. The victims in the case identified "at least seven separate acts of statutory sodomy that occurred at different times (some more than three days apart) and in different locations" within the house in which they lived with their mother, who was the defendant, and her boyfriend. Id. at 156. The Court found that, "[d]espite evidence of multiple, separate incidents of statutory sodomy, the verdict directors failed to differentiate between the various acts in a way that ensured the jury unanimously convicted [the defendant] of the same act or acts." Id. Instead, the verdict directors (one for each victim) allowed the jury to find the defendant guilty of first degree statutory sodomy if the jurors believed " 'that between [specified dates] ... the defendant or [her boyfriend] placed her or his hand on [the victim's] genitals....' " Id. The Court explained that the verdict directors were erroneous because they allowed a finding of guilt when jurors may not have unanimously agreed on the same specific act of sodomy:
This broad language allowed each individual juror to determine which incident he or she would consider in finding [the defendant] guilty of statutory sodomy. Under the instructions, the jurors could convict [the defendant] if they found that she engaged or assisted in hand-to-genital contact with the children during an incident in her bedroom, or on the enclosed porch, or in the shed, or in the bathroom.
Id.
The Court ruled that, in a multiple acts case, the defendant's right to a unanimous verdict could be protected by having either: (1) the State "elect[ ] the particular criminal act on which it will rely to support the charge or (2) the verdict director specifically describ[e] the separate criminal acts presented to the jury and the jury ... instructed that it must agree unanimously that at least one of those acts occurred." Id. at 157 (footnote omitted).
Before applying the principles of Celis-Garcia to the instructions in this case, we find that, contrary to Beck's assertion, not all of the counts involved multiple acts. "To establish a multiple acts case, there must be evidence of multiple, distinct criminal acts" charged in a single count. State v. Drake , 514 S.W.3d 633, 642 (Mo. App. 2017). Count III charged Beck with first-degree statutory sodomy for placing his mouth on A.O.'s vagina. The verdict director for Count III was Instruction No. 11, and it stated, in relevant part:
As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
First, that on or between November 18, 2005 and November 17, 2012, in the County of Jackson, State of Missouri, the defendant knowingly placed defendant's mouth on A.O.'s vagina,
Second, that such conduct constituted deviate sexual intercourse, and
Third, that at the time A.O. was a child less than twelve years old,
Then you will find the defendant guilty under Count III of statutory sodomy in the first degree under this instruction.
At trial, A.O. testified that Beck put his mouth on her vagina when she was in the fifth grade. A.O. said that this occurred when she was sleeping in her sister's room. When asked at trial whether he touched his mouth to her vagina "one time or more than one time," A.O. responded, "That happened one time." A.O.'s trial testimony *416 was consistent with what she told the forensic interviewer on this issue. During her CPC interview, she described the incident in more detail, but she repeatedly affirmed that she was referring to the "one time" and "that time" when Beck put his mouth on her vagina, when she was eleven or twelve years old, and when she was sleeping in her sister's room. Because there was no evidence of multiple distinct criminal acts, the jury's conviction of Beck for first-degree statutory sodomy as charged in Count III was unanimous and specific. See id.
As for the remaining counts, the verdict director for Count I, first-degree statutory sodomy based upon Beck's placing his penis in A.O.'s anus, was Instruction No. 5. It stated, in relevant part:
As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
First, that on or between November 18, 2005 and November 17, 2012, in the County of Jackson, State of Missouri, the defendant knowingly placed defendant's penis in A.O.'s anus, and
Second, that such conduct constituted deviate sexual intercourse, and
Third, that at the time A.O. was a child less than twelve years old,
[T]hen you will find the defendant guilty under Count I of statutory sodomy in the first degree under this instruction.
At trial, A.O. testified specifically about the first time that Beck put his penis in her anus, when she was in preschool or kindergarten. She was asleep in her bedroom, and Beck was in the same room, on the computer, looking at pictures of women on the Internet. Beck told her to come over to him, pulled down her pants, put her hands on her hips, and put his penis in her anus. Although A.O. testified that Beck anally sodomized her five or six times, she did not testify at trial about any other specific incidents of anal sodomy. In her CPC interview that was played for the jury, however, A.O. told the forensic interview about other specific incidents of anal sodomy, including one time in the presence of her little brother, who was watching television in the same room; another time when she was sleeping in her sister's room, he came in the room at 2:00 a.m., and she tried to wrap herself in her covers; another time when she was eleven years old and was sleeping in the basement; and another time when she was eleven or twelve years old and was sleeping in her sister's room without her sister there.
Despite evidence of at least five specific incidents in which Beck put his penis in A.O.'s anus, the verdict director did not comply with Celis-Garcia . The State did not elect the particular criminal act on which it would rely to support the charge; nor did the verdict director specifically describe the separate criminal acts presented to the jury and instruct the jury that it must agree that at least one of those acts occurred. Celis-Garcia , 344 S.W.3d at 157. Without greater specificity in the verdict director, such as the victim's approximate age (e.g., five or six, eleven, eleven or twelve) or location (e.g., in her bedroom, in her bedroom with her little brother, in her sister's room, or in the basement), we have no way of knowing if the jury unanimously agreed upon which of the five acts provided the basis for the conviction on Count I. See State v. Rycraw , 507 S.W.3d 47, 62 (Mo. App. 2016). Under this verdict director, the jurors could have found Beck guilty of anally sodomizing A.O. when she was five or six years old alone in her bedroom; or when she was alone in her sister's room, he came in at 2:00 a.m., and she tried to wrap herself in her covers; or when she was in the room with her little brother; or when she was eleven years old and in the basement; or *417 when she was eleven or twelve years old and alone in her sister's room. See Hoeber v. State , 488 S.W.3d 648, 655 (Mo. banc 2016). Therefore, the verdict director "created a real risk that the jurors did not unanimously agree on the specific act[ ] of statutory sodomy for which they found [Beck] guilty" on Count I and, consequently, "failed to ensure a unanimous jury verdict." Id. The verdict director for Count I was, on its face, plainly erroneous. State v. Carlton , 527 S.W.3d 865, 877 (Mo. App. 2017).
The verdict director for Count II, first-degree statutory sodomy based upon Beck's placing his penis in A.O.'s mouth, was Instruction No. 8. It stated, in relevant part:
As to Count II, if you find and believe from the evidence beyond a reasonable doubt:
First, that on or between November 18, 2005 and November 17, 2012, in the County of Jackson, State of Missouri, the defendant knowingly placed defendant's penis in A.O.'s mouth,
Second, that such conduct constituted deviate sexual intercourse, and
Third, that at the time A.O. was a child less than twelve years old,
Then you will find the defendant guilty under Count II of statutory sodomy in the first degree under this instruction.
At trial, A.O. testified that the first time Beck put his penis into her mouth was when she was in preschool or kindergarten, sleeping alone in her bedroom, and he was on the computer looking at pictures of naked women on the Internet. She testified that, during that first incident of oral sodomy, he told her to "suck it like a lollipop." While A.O. testified that he made her engage in oral sodomy more times than she could count, she did not testify at trial about any other specific incidents. During her CPC interview, however, she told the forensic interviewer about other specific incidents of oral sodomy, including when she was eleven years old and sleeping in the basement and when she was eleven or twelve years old and sleeping in her sister's room.
Despite evidence of at least three distinct acts of Beck's putting his penis in A.O.'s mouth, the verdict director failed to ensure that the jury unanimously based its conviction on Count II on the same underlying criminal acts. Like the verdict director for Count I, the verdict director for Count II did not specify a particular act and did not caution the jury that it must unanimously agree on the specific act committed. Id. at 874. Under this verdict director, jurors could have found Beck guilty of orally sodomizing A.O. when she was five or six years old, in preschool or kindergarten, and alone in her room; or when she was eleven years old and in the basement, or when she was eleven or twelve years old and alone in her sister's room. Therefore, the verdict director for Count II failed to ensure a unanimous verdict and was plainly erroneous. Id. at 877.
The verdict director for Count IV, first-degree child molestation based upon Beck's touching A.O.'s genitals, was Instruction No. 14. It stated, in relevant part:
As to Count IV, if you find and believe from the evidence beyond a reasonable doubt:
First, that on or between November 18, 2005 and November 17, 2012, in the Count of Jackson, State of Missouri, the defendant touched the genitals of A.O., and
Second, that defendant did so for the purpose of arousing or gratifying the defendant's sexual desire, and
Third, that A.O. was a child less than fourteen years old, *418 [T]hen you will find the defendant guilty under Count IV of child molestation in the first degree under this instruction.[1]
At trial, A.O. testified that, when she was in fifth grade and sleeping in her sister's room without her sister there, Beck tried to put his penis in her vagina. Just the tip of his penis went inside of A.O.'s vagina because she fought him. During her CPC interview, A.O. told the interviewer about that incident, which she said happened when she was eleven or twelve years old. She also told the interviewer that, during that incident, Beck placed his fingers in her vagina. Additionally, A.O. told the forensic interviewer that, during the incident that occurred in the basement when she was eleven years old, Beck tried to put his penis in her vagina. Again, A.O. struggled and was able to stop him from putting his penis inside of her.
The evidence at trial indicated that Beck touched A.O.'s genitals with his genitals on two distinct occasions-once when she was eleven or twelve years old, in fifth grade, and sleeping alone in her sister's room, and once when she was eleven years old and sleeping in the basement. The evidence further showed that Beck also touched A.O.'s genitals with his hands during the incident that occurred when she was eleven or twelve years old, in fifth grade, and sleeping alone in her sister's room. Because the verdict director for Count IV did not specify a particular act of Beck's touching A.O.'s genitals with either his genitals or his hands and did not caution the jury that it must unanimously agree on the specific act committed, jurors could have relied on any of these three acts to find Beck guilty of first-degree child molestation. Therefore, the verdict director for Count IV failed to ensure a unanimous verdict and was plainly erroneous. Id.
Having found that the verdict directors for Counts I, II, and IV were plainly erroneous, we must next consider whether that error resulted in manifest injustice or a miscarriage of justice warranting reversal. Celis-Garcia , 344 S.W.3d at 158. The State argues that Beck did not suffer manifest injustice or miscarriage of justice because, during its closing argument, the State focused the jury's attention on a single incident for each count. As we noted in State v. Escobar , 523 S.W.3d 545, 551 (Mo. App. 2017), however, "the State's clarification of the acts they were charging in closing argument cannot cure the failure of the State to specify in the jury instructions the [three] instances of conduct to support the charges [in Counts I, II, and IV] as we must presume that the jury followed the jury instructions as written [and] not the State's closing argument." The plain language of the verdict directors for Counts I, II, and IV allowed non-unanimous verdicts. Moreover, Instruction No. 19 told jurors that closing arguments were not evidence and that it was their duty "to render such verdict under the law and the evidence as in your reason and conscience is true and just." See Rycraw , 507 S.W.3d at 64. In light of these instructions, which we must presume the jury followed, "we cannot conclude beyond a reasonable doubt that the jury disregarded the plain language of the verdict directors ... and the other instructions, and decided instead to follow the prosecutor's argument." Id.
*419 The State contends that this case is similar to the circumstances in Escobar and that we should find, as we did in that case, no manifest injustice or miscarriage of justice. We disagree. In Escobar , the State submitted verdict directors for two counts of first-degree child molestation, both of which were based on the identical allegation that the defendant touched the victim's breast. 523 S.W.3d at 547-48. One count alleged that the act occurred between November 1, 2012, and February 1, 2013, while the other count alleged that the act occurred between February 2, 2013, and April 30, 2013. Id. at 548. The victim testified at trial to repeated, identical acts of abuse occurring between November 1, 2012, and April 30, 2013, but the State elicited specific evidence about only the first act and the last act that the victim could remember. Id. at 552.
Reviewing the propriety of the verdict directors for plain error on appeal, we found that the circuit court erred in failing to submit verdict directors "sufficiently describing the underlying criminal acts charged in order to ensure that the jury would be unanimous as to the criminal act." Id. at 551. However, we found that the defendant failed to prove manifest injustice or a miscarriage of justice. Id. at 552-53. Specifically, we found that the defendant did not establish that the instructional error affected the verdict, because there was specific evidence about only two acts of abuse-one for each count-and the defendant presented no conflicting evidence to contest the victim's allegations "other than a general denial that any of the abuse had occurred." Id. at 553.[2]
In this case, while the State limited its inquiry of A.O. at trial to only one specific act per count, the State also played A.O.'s CPC interview for the jury. In her CPC interview, A.O. specifically described, in detail, multiple acts for each of Counts I, II, and IV. The jury could have easily relied upon different acts to find Beck guilty on those counts. Indeed, as the court in Carlton , 527 S.W.3d at 878, explained:
We cannot pretend to know what occurred in the jury room. However, the overly generalized ... verdict directors, lacking in any admonition that their unanimity on the specific acts committed was required, did not ensure that the jurors were properly instructed before their deliberation. To the contrary, the verdict directors allowed each individual juror to select any, all, or only one act of abuse from the larger pool of alleged criminal acts presented by the State. The jurors could select specific instances from the alleged criminal acts, independently from each other, as their basis for returning convictions.... Accordingly, the plainly erroneous verdict directors created a juror free-for-all that resulted in manifest injustice by negating [the defendant]'s constitutional right to a unanimous jury verdict.
The verdict directors on Counts I, II, and IV misdirected the jury in a way that affected the verdict and denied Beck his constitutional protection of a unanimous jury, which resulted in a miscarriage of justice. Drake , 514 S.W.3d at 641. Beck's convictions for first-degree sodomy under Counts I and II and first-degree child molestation under Count IV are reversed. He is entitled to a new trial on those charges. Point I is granted as to Counts I, II, and IV and denied as to Count III.
Point II-Sufficiency of Second Amended Information
In Point II, Beck contends the circuit court erred in overruling his motion *420 for new trial because the second amended information failed to state an offense and was vague. All four counts in the second amended information alleged that the act referenced in each count occurred "on or between November 18, 2005 and November 17, 2012, in the County of Jackson, State of Missouri." Beck argues that the charges were insufficient because they did not allege a specific time and did not allege a specific place in Grandmother's house where the abuse occurred.
Beck concedes that he did not raise any objection to the second amended information at trial. When the sufficiency of the charging instrument is raised for the first time after the verdict, the Supreme Court has held that it will be "deemed insufficient only if it is so defective that (1) it does not by any reasonable construction charge the offense of which the defendant was convicted or (2) the substantial rights of the defendant to prepare a defense and plead former jeopardy in the event of acquittal are prejudiced." State v. Parkhurst , 845 S.W.2d 31, 35 (Mo. banc 1992). The defendant must demonstrate actual prejudice, which is that "the information or indictment was either so deficient that the defendant was not placed on notice as to what crime he or she was being charged with or was so lacking in clarity that the defendant was unable properly to prepare a defense." State v. Williams , 126 S.W.3d 377, 381 (Mo. banc 2004).
Applying this standard, we find that the information identified the offenses and stated specific factual allegations constituting the elements of each offense as required by Rule 23.01(b)(2). The second amended information was sufficient to place Beck on notice that he was being charged with three first-degree statutory sodomy offenses under Section 566.062, RSMo 2016,[3] and one first-degree child molestation offense under Section 566.067. Hence, Beck is entitled to relief under Parkhurst only if he can prove that the failure to provide more details actually prejudiced his ability to prepare a defense or plead former jeopardy in the event of an acquittal. State v. Williams , 502 S.W.3d 90, 96 (Mo. App. 2016).
Beck contends that the second amended information's broad time frame prejudiced his ability to prepare his defense. However, in response to the State's request to file the second amended information which narrowed the scope of the time alleged from between A.O.'s fifth and fourteenth birthdays to between A.O.'s fifth and twelfth birthdays, defense counsel told the court that he wanted "the record to reflect that" he and Beck had prepared for trial for events within the dates alleged in the first amended information, that is, up to A.O.'s fourteenth birthday. Defense counsel also told the court that the filing of the second amended information "doesn't change the trial strategy at all." Beck has failed to demonstrate that the time period alleged in the second amended information substantially prejudiced his ability to prepare his defense.
Likewise, Beck has failed to demonstrate that the time period alleged in the second amended information prejudiced his ability to plead former jeopardy in the event of an acquittal. In the second amended information, Beck was charged with committing three acts of first-degree statutory sodomy and one act of first-degree child molestation between November 18, 2005, and November 17, 2012. Beck cannot be successively prosecuted or punished for any additional acts of first-degree statutory sodomy or first-degree child molestation encompassed by the charged time period. Point II is denied.
*421 Point III-Assistant Prosecutor's Conduct During Defense Counsel's Closing
In Point III, Beck contends the circuit court erred in denying his claim in his motion for new trial that the assistant prosecutor's conduct during his counsel's closing argument violated his rights to due process, a fair trial, and a fair and impartial jury. We review the denial of a motion for new trial for an abuse of discretion. State v. Moore , 411 S.W.3d 848, 852 (Mo. App. 2013).[4] An abuse of discretion occurs when the court's "ruling is clearly against the logic of the existing circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." State v. Smith , 389 S.W.3d 194, 206 (Mo. App. 2012).
In the hearing on Beck's motion for new trial, Beck's "long time" family friend, Robert Early, testified that, during defense counsel's closing argument, the assistant prosecutor stood behind defense counsel, shook her head, and "show[ed] disgust" at what defense counsel was saying. Kenneth Boles, another friend of Beck's family, testified that he saw the assistant prosecutor nodding her head, "showing disgust," and gesturing like she did not believe what defense counsel was saying during his closing. Grandmother testified that she observed the assistant prosecutor "shaking her head in disgust" and "mouthing something" during defense counsel's closing. Early, Boles, and Grandmother believed the jury could see the assistant prosecutor's actions. Defense counsel told the court that he "heard sounds behind [him]" during his closing argument, but he "had no idea who it was."
Beck argues that the circuit court abused its discretion in denying this claim because the assistant prosecutor's actions constituted an improper "personal unsubstantiated attack on the character and ethics of opposing counsel," in violation of his constitutional rights to due process, a fair trial, and a fair and impartial jury. We disagree.
Where, as here, the circuit court made no factual findings, "we 'must assume that all facts were found in accordance with the result reached.' " State v. Johnstone , 486 S.W.3d 424, 435 (Mo. App. 2016) (citation omitted). Furthermore, the court was "free to believe all, part, or none of the testimony presented by the witnesses at the evidentiary hearing." State v. Ess , 453 S.W.3d 196, 202-03 (Mo. App. 2015). Applying these principles, we assume that the court did not believe the testimony of Beck's family and friends about the assistant prosecutor's alleged conduct. Indeed, the court was present during closing arguments and had the opportunity to observe counsel and the jury. The court was in a better position to observe whether the alleged conduct occurred and, if it did, whether there was any prejudicial effect. See State v. Dvorak , 295 S.W.3d 493, 502 (Mo. App. 2009). Deferring to the circuit court's credibility determinations and its superior ability to determine not only whether the alleged conduct occurred and, if so, whether it resulted in prejudice, we find that the court did not abuse its discretion in denying Beck's motion for a new trial on this basis. Point III is denied.
Point IV-State's Closing Argument
In Point IV, Beck contends the circuit court erred by not sua sponte intervening *422 during the State's closing argument when the State referred to Grandmother as an "enabler" of Beck. He concedes that he did not object to this comment at trial. Therefore, he requests plain error review.
Statements made in closing argument will rarely amount to plain error when the challenging party did not object at trial because any assertion that the circuit court erred in failing to intervene sua sponte ignores the possibility that counsel may not have objected for strategic reasons. State v. Carter , 415 S.W.3d 685, 691 (Mo. banc 2013). Without an objection, the circuit court's options "are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." State v. Clemmons , 753 S.W.2d 901, 907-08 (Mo. banc 1988). Moreover, a party cannot fail to request relief, gamble on the verdict, and then, if adverse, request relief for the first time on appeal. State v. McGee , 848 S.W.2d 512, 514 (Mo. App. 1993). "To prevail under the plain error standard, the defendant must show that the statements during closing argument had a decisive effect on the jury." Carter , 415 S.W.3d at 691.
During its rebuttal argument, the State argued the credibility of various witnesses. In discussing Grandmother, who testified on behalf of Beck, the State said: "You know, you heard from the defendant's mother, who conveniently remembers dates that are helpful to her son. You also heard some things, that she would do just about anything to enable him. He and his wife and kids still live there at her house." Beck argues that there was no evidence to support the State's characterization of Grandmother as his "enabler."
We find no error, plain or otherwise, in the State's argument. "The State, just like the defense, has wide latitude in drawing inferences from the record when presenting its closing argument." State v. Forrest , 183 S.W.3d 218, 228 (Mo. banc 2006). The record showed that Grandmother had allowed Beck, who was 44 years old at the time of trial, to live with her for the past 20 years. The record further showed that, after Beck first assaulted A.O., she told Grandmother about Beck's looking at pictures of naked women on the internet in her presence and Grandmother did nothing about it. Additionally, A.O. testified, without objection, that she believed that, even if Grandmother had known about the sexual abuse, she would not have said anything and would have allowed it to go on. It was not improper for the State to infer from this evidence that Grandmother was an "enabler" of Beck. Furthermore, Beck has not demonstrated that the State's characterization of Grandmother as an enabler had a decisive effect on the jury. Point IV is denied.
Point V-Admission of Killough's Diagnosis that A.O. was Sexually Abused
In Point V, Beck contends the circuit court erred in allowing Killough, the physician who examined A.O. at Children's Mercy after A.O. disclosed the abuse, to testify that she diagnosed A.O. with child sexual abuse. He argues that, because Killough's diagnosis was based on A.O.'s statements to her, Killough's diagnosis was designed to corroborate A.O.'s credibility and was more prejudicial than probative. He did not object to the admission of this testimony at trial and, therefore, requests plain error review.
"While an expert witness should not be permitted to comment on the veracity of another witness, an expert is permitted to testify as to his or her opinion on an ultimate issue in a criminal case as long the opinion does not state that the defendant is guilty of the crime." State v. Wadlow , 370 S.W.3d 315, 322 (Mo. App. 2012).
*423 Here, Killough testified that she diagnosed A.O. with child sexual abuse, that this was a medical diagnosis, and, like any other medical diagnosis, it was based on A.O.'s history and a physical exam. Killough did not state that Beck was guilty of the abuse, nor did she comment on A.O.'s veracity. Killough's diagnosis of sexual abuse, "although based in part on [A.O.'s] allegations of abuse, does not facially establish substantial grounds to believe a manifest injustice or miscarriage of justice has occurred." State v. Fewell , 198 S.W.3d 691, 698 (Mo. App. 2006) (holding that, where child had no physical injuries, doctor's opinion that child was sexually abused did not vouch for child's credibility and did not constitute plain error even though it was based in part on child's allegations of abuse). Beck has failed to demonstrate a manifest injustice from the admission of Killough's testimony.
Moreover, we note that it was Beck, and not the State, who repeatedly emphasized Killough's diagnosis of child sexual abuse during closing arguments. In fact, the State did not even mention Killough or her diagnosis in its closing argument until rebuttal, in response to Beck's comments. See Wadlow , 370 S.W.3d at 322. Beck has failed to demonstrate that he suffered any prejudice, let alone a manifest injustice or miscarriage of justice, from the admission of Killough's diagnosis. Point V is denied.
Point VI-Cross-Examination of A.O. About Other Sexual Abuse
In Point VI, Beck contends the circuit court erred in refusing to allow him to cross-examine A.O. about whether she made inconsistent statements regarding whether her older brother had sexually abused her. He argues that this evidence did not concern her prior sexual conduct and was relevant to a material issue in the case; therefore, it should not have been excluded under the rape shield statute, Section 491.015.
The circuit court "has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." State v. Hart , 404 S.W.3d 232, 248 (Mo. banc 2013). Before trial, the State filed a motion in limine seeking to exclude matters protected by the rape shield statute. Specifically, the State explained that, in A.O.'s forensic interview, she denied that anyone else had done "something to her body which she did not want him or her to do." In depositions, however, A.O. indicated that her older brother had sexually abused her. The State believed that Beck intended to impeach A.O. with this evidence. In a pretrial hearing on the State's motion, Beck argued that he did, in fact, intend to impeach A.O. with this evidence as a "prior inconsistent statement" and argued that it "has nothing to do with rape shield." The court sustained the State's motion in limine to exclude it. During A.O.'s trial testimony, Beck again requested that he be allowed to elicit this evidence, and the court again denied his request.
The rape shield statute "creates a presumption that a victim's prior sexual conduct is not relevant to sex-crime prosecutions." Rycraw , 507 S.W.3d at 56. This statute provides that "evidence of specific instances of the complaining witness' prior sexual conduct ... is inadmissible," unless one of the four exceptions listed in the statute applies.[5] § 491.015.1. If one of the *424 exceptions applies, then the evidence "is admissible to the extent that the court finds the evidence relevant to a material fact or issue." § 491.015.2.
Beck asserts that the rape shield statute does not apply in this case because the evidence he wanted to elicit-that A.O. had made inconsistent statements about whether anyone else had sexually abused her-did not involve "sexual conduct." He argues that he did not intend to "go into A.O.'s sexual conduct" but, rather, that his examination "was only to a matter that affected her credibility."
We rejected this same argument in State v. Smith , 996 S.W.2d 518, 521-22 (Mo. App. 1999). In Smith , the defendant wanted to elicit evidence that the victim initially denied in a deposition that she had ever let a boy "go up [her] shirt" or "down [her] pants," but then later admitted in the same deposition that those denials were lies. Id. at 521. The defendant in Smith , like Beck, argued that "he did not want to go into the circumstances or nature of the lie, but only wanted to question her as to whether she had, in fact, lied in her deposition." Id. We found this argument unpersuasive, noting that, "[i]f we were to accept this contention, it would mean that any lie, regardless of the admissibility, relevancy, or remoteness of the subject matter on which the witness lied, would be admissible, as a matter of law, as a permissible attack on witness credibility." Id. at 522.
We found the Supreme Court's decision in State v. Madsen , 772 S.W.2d 656 (Mo. banc 1989), to be controlling. Smith, 996 S.W.2d at 522. In Madsen , the defendant sought to cross-examine the victim about prior inconsistent statements she had made concerning when she last had sexual relations with a person other than the defendant. 772 S.W.2d at 661. The Court in Madsen found no error in the court's prohibiting this cross-examination, holding that, because the evidence concerning the victim's prior inconsistent statements did not fall under any of the exceptions to the rape shield statute, the "attempted impeachment" was "inadmissible under the rape shield statute." Id. The Court further held that "[t]here is no right to impeach by showing inconsistent statements unless those statements are relevant and admissible." Id.
Applying Madsen , we found in Smith that evidence as to whether the victim had ever allowed a boy to go up her shirt or down her pants was evidence of specific instances of prior sexual conduct that did not fall under any of the exceptions to the rape shield statute. Smith, 996 S.W.2d at 522. Accordingly, we held that such evidence was irrelevant and inadmissible and, therefore, the court "did not err and abuse its discretion in preventing the [defendant] from inquiring whether the victim lied in her deposition concerning these matters." Id.
As in Madsen and Smith , evidence as to whether A.O. had been sexually abused by her brother was evidence of a specific instance of prior sexual conduct that did not fall under any of the exceptions to the rape shield statute. Thus, pursuant to Madsen and Smith , this evidence was irrelevant and inadmissible, and the circuit court did not abuse its discretion in denying Beck's request to cross-examine A.O. regarding *425 whether she lied in her prior statements about it. Point VI is denied.
Point VII-Alleged Juror Misconduct
In Point VII, Beck contends the circuit court erred in denying his requests for various forms of post-trial relief including a new trial, a hearing, an order permitting defense counsel to interview the jurors, an order permitting defense counsel to call Juror No. 1 as a witness in the hearing on the motion for new trial, and an order granting his motion to produce Juror No. 1's employment records. All of these requests for relief were based upon Beck's claim that he belatedly recognized Juror No. 1 as someone he believed was a pod officer assigned to the same pod in the Jackson County Jail where he spent a month before being released on bond. Although Juror No. 1 was excused prior to deliberations, Beck argues that he was "possibly prejudiced by the presence of Juror No. 1 in the jury during the trial" because "there is a possibility that Juror No. 1 could have imparted prejudicial information to the other jurors while she sat on the jury."
During voir dire, Juror No. 1 stated that she had worked for the Jackson County Department of Detention in downtown Kansas City for six years and nine months but left two weeks before trial. Juror No. 1 stated that there was nothing about her employment or separation that would render her unable to be fair and impartial to the State or the defense. She indicated that she did not know Beck. Defense counsel did not challenge Juror No. 1 for cause or raise a peremptory challenge, so she served on the jury.
During the trial, the State complained that the defense was strategizing near where Juror No. 1 was sitting during a recess. Defense counsel told the court that he was aware of Juror No. 1's presence during the recess but denied that she could hear him. Additionally, the State complained that Juror No. 1 had been falling asleep throughout the trial. The court and the parties discussed Juror No. 1's falling asleep on two other occasions later in the trial. Following closing arguments, the court announced its intention to dismiss Juror No. 1 and gave the parties the opportunity to object. Both parties stated that they had no objection to her dismissal, so she was dismissed prior to deliberations.
In an affidavit attached to his motion for new trial, Beck alleged that, when Juror No. 1 was excused just before deliberations, he recognized her as someone he "believed" was his pod officer when he was detained in the Jackson County Jail for approximately one month before being released on bond. He averred that he did not recognize her as his pod officer until that time because of the seating arrangement in the courtroom.
During the hearing on his motion for new trial, Beck testified that the last time he took a look at Juror No. 1, at "the very end" of trial, he "thought that she looked familiar." He reiterated that he did not recognize her earlier in the trial because of the seating arrangement in the jury box and because he was instructed not to look at the jury. On cross-examination, Beck admitted that Juror No. 1 would have been the last juror in and the first juror out every time the jury entered and exited the courtroom during the trial. He admitted that he recognized her when she was dismissed prior to deliberations. He testified that he did not tell the court about it at that time, however, because he "was in shock." Defense counsel argued that Juror No. 1 "may well have said to the other jurors during informal discussions that she recognized him because he was in the jail." The court overruled Beck's requests for relief on this claim.
*426 We will not disturb the circuit court's ruling on a claim of juror misconduct unless we find an abuse of discretion. State v. Brown , 939 S.W.2d 882, 883 (Mo. banc 1997). "When juror misconduct occurs during a felony trial, the verdict will be set aside unless the state affirmatively proves that despite the misconduct, the other jurors were not subjected to improper influences." Id. The burden of proof does not shift to the State until after the defendant establishes misconduct, however. Id.
In this case, Beck was fully aware that Juror No. 1 was employed at the Jackson County Department of Detention during the time that he was incarcerated, as she disclosed her employment and the time frame of her employment during voir dire. She also indicated that she did not know Beck. If Beck wanted to know whether she worked as his pod officer in the course of her employment and possibly recognized him from that context, he could have brought the matter to the court's attention and requested leave to ask her those questions outside the hearing of the other venire members. He did not. "A venireperson cannot be found to have intentionally concealed an answer to a question that was never asked." Id. at 884.
Moreover, given the attention that was placed on Juror No. 1 throughout the trial due to her sleeping and Beck's strategizing near where she was sitting during a recess, and the fact that Juror No. 1 was the last juror in and the first juror out every time the jury entered and exited the courtroom during the trial, the court could have found Beck's claim that he did not recognize her until she was dismissed to be implausible. Even if the court did believe that Beck failed to recognize Juror No. 1 until she was dismissed, however, Beck admitted that he did not bring it to the court's attention at that time. A defendant claiming juror misconduct must call such fact to the court's attention as soon as he learns of it and has the opportunity to report it. State v. Mayes , 63 S.W.3d 615, 625 (Mo. banc 2001).
Furthermore, Beck's contention that he was "possibly prejudiced" by Juror No. 1's presence on the jury because, even though she did not deliberate with the jury, there was a "possibility that Juror No. 1 could have imparted prejudicial information to the other jurors while she sat on the jury" is belied by the record. Prior to every recess, the circuit court admonished the jurors not to discuss the case among themselves or with others or to permit anyone else to discuss it within their hearing. The jury is presumed to have followed the court's instructions. State v. Evans , 490 S.W.3d 377, 383 (Mo. App. 2016).
Under these circumstances, we cannot say that the circuit court abused its discretion in denying all of Beck's requested forms of relief based upon his allegation of juror misconduct. Point VII is denied.
CONCLUSION
Beck's convictions on Counts I, II, and IV are reversed, and the case is remanded. The judgment is affirmed in all other respects.
All Concur.

Although Count IV of the second amended information charged Beck with committing first-degree child molestation by touching A.O.'s genitals with his genitals, the verdict director did not limit the touching to genital-to-genital contact. Under Sections 566.067 and 566.010(5), RSMo 2016, the crime of first-degree child molestation includes both genital-to-genital contact and hand-to-genital contact.

In Escobar , we noted that, according to the Supreme Court in Hoeber , 488 S.W.3d at 656-57, the nature of the defense mounted by the defendant is "[r]elevant, but not determinative to" the inquiry as to whether the error affected the verdict. Id. at 551-52.

All statutory references are to the Revised Statutes of Missouri 2016.

Because the assistant prosecutor's conduct allegedly occurred behind defense counsel's back, Beck asserts that his counsel had no ability to observe the conduct and, therefore, no ability to contemporaneously object to it at trial.

These exceptions are:
(1) Evidence of the sexual conduct of the complaining witness with the defendant to prove consent where consent is a defense to the alleged crime and the evidence is reasonably contemporaneous with the date of the alleged crime; or
(2) Evidence of specific instances of sexual activity showing alternative source or origin of semen, pregnancy or disease;
(3) Evidence of immediate surrounding circumstances of the alleged crime; or
(4) Evidence relating to the previous chastity of the complaining witness in cases, where, by statute, previously chaste character is required to be proved by the prosecution.
§ 491.015.1(1)-(4).